UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| ROBERT SCOTT SUPER, | ) | Case No. 8:26-bk-04258-CPM |
| | ) | Chapter 13 |
| Debtor. | ) | |
| | ) | |

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND FOR PROSPECTIVE STAY RELIEF PURSUANT TO 11 U.S.C. § 362 AND FOR RELIEF FROM THE 14-DAY STAY IMPOSED BY FED. R. BANKR. P. 4001(a)(4)

Genesis Alternative Finance IV LLC and Genesis Alternative Finance V LLC (collectively, "Genesis" or the "Movants"), by and through their undersigned counsel, file this *Motion for Relief from the Automatic Stay and for Prospective Stay Relief Pursuant to 11 U.S.C. § 362* (the "**Motion**"). Movants seek relief to allow their state court litigation to move forward so that the remaining damages issue can be resolved and any judgment awarded in their favor can be reduced to an amount certain. Any such judgment will establish the amount of a claim Movants may have against the estate and thus benefit the Debtor's estate and its creditors, as it will aid in calculating total outstanding claims and the dischargeability of such claims. Movants also seek prospective stay relief should the above-captioned bankruptcy case be dismissed and a subsequent case be filed.

### JURISDICTION

1.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### PROCEDURAL BACKGROUND

1

200955254v2

3.     On May 19, 2026 (the "**Petition Date**"), Debtor filed his voluntary petition for relief under Chapter 13 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**").

4.     This is the Debtor's second bankruptcy filing in approximately five weeks. The Debtor previously filed a voluntary petition under Chapter 13 on April 13, 2026 (Case No. 8:26-bk-03006-CPM), which he voluntarily dismissed on April 30, 2026.

5.     Concurrently with this Motion, Movants have filed their *Motion to Dismiss Chapter 13 Case and to Bar Refiling for 180 Days* (the "**Motion to Dismiss**"), seeking dismissal of this case for cause under 11 U.S.C. § 1307(c) and a bar on refiling pursuant to 11 U.S.C. §§ 105(a) and 109(g).

6.     Movants seek relief from the automatic stay, to allow the State Court Action (defined below) to proceed and for prospective stay relief should the Debtor file a subsequent bankruptcy case.

<u>**FACTUAL BACKGROUND**</u>

7.     The Debtor was the principal of Lint Chiropractic P.C., Diagnostic Chiropractic MI, P.C., and Supplies Plus MI, LLC (the "**Entity Defendants**"), which provide chiropractic services and medical products to individuals injured in automobile accidents in Michigan.

8.     Beginning in 2021, Genesis provided approximately $2.4 million in funding to the Entity Defendants' underwritten No-Fault Auto Advance Security Agreements, supported by thirteen promissory notes. Under these agreements, the Entity Defendants agreed to pay Genesis specified "Return Amounts" within fifteen months of the commencement date of each promissory note. *Id.*

200955254v2

9. The Entity Defendants, led by the Debtor, accepted those funds, pledged security interests, and executed promissory notes—then transferred $2.35 million of the $2.38 million advanced, nearly the entire amount, to shell entities Debtor owned and controlled, or directly to Debtor, personally. **Exhibit "A,"** Opinion and Order at 13-14; **Exhibit "B,"** Receiver's Report ¶¶ 36-37. The loan advances never remained in the Entity Defendants' accounts for more than a few days. Exhibit "B," Receiver's Report ¶ 37.

10. Additionally, the Entity Defendants collected approximately $572,751.57 on secured receivables that should have been remitted to Genesis and instead wrongfully retained those funds. Exhibit "A," Opinion and Order at 20-21; Exhibit "B," Receiver's Report ¶ 21.

11. On July 19, 2024, Genesis filed suit against the Debtor, Entity Defendants, and Richard Geller in the Wayne County Circuit Court, Michigan Business Court (the "**State Court**"), Case No. 24-010404-CB (the "**State Court Action**"), alleging breach of contract, statutory and common law conversion, and related claims.

12. On January 8, 2025, the State Court appointed Charles D. Bullock as receiver ("**Receiver**") over the Entity Defendants. **Exhibit "C,"** Order for Receivership.

13. On April 7, 2025, the State Court found the Entity Defendants in contempt of court and imposed $10,000 in sanctions, which remain unpaid. **Exhibit "D,"** Order for Sanctions.

14. On February 26, 2026, the State Court issued its Opinion and Order granting, in part, Genesis's Motion for Summary Disposition. The State Court found:

    a. The Entity Defendants are liable for breach of contract (Counts I and IX).

    b. The Entity Defendants are liable for statutory conversion and common law conversion (Counts III and IV) for wrongfully retaining $572,751.57 in collections belonging to Genesis.

200955254v2

c.	Super [(i.e., Debtor)] shall be held personally liable for the damages sought, because his corporations were "mere instrumentalities" used "to subvert justice," no corporate formalities were followed, the entities were undercapitalized, and the Entity Defendants were "a sham." Motion to Dismiss, Exhibit "A," Opinion and Order at 17-18.

15.	The State Court ordered the parties to submit supplemental briefs on damages by April 8, 2026, after which the Court was to determine the amount of damages. Genesis has sought damages in excess of $5.7 million. Defendants, including the Debtor, have not provided a damages brief or contested the amount of damages sought by Movants.

16.	Trial in the State Court Action was originally scheduled for April 14, 2026. Just one day before trial, on April 13, 2026, the Debtor filed his first bankruptcy petition, triggering the automatic stay and resulting in a continuance. After the Debtor dismissed that bankruptcy case on April 30, 2026, trial was rescheduled to May 20, 2026. The Debtor then filed the instant petition on May 19, 2026—again, one day before the rescheduled trial.

## RELIEF REQUESTED

17.	Movants seek relief from the automatic stay under 11 U.S.C. § 362(d) to allow the State Court Action to move forward and permit the State Court to determine the amount of damages owed. Reducing any judgment to an amount certain will assist this Court in obtaining a more accurate picture of the Debtor's total outstanding obligations and will allow for an accurate calculation of Genesis's claim in connection with any claims allowance or dischargeability proceedings in this case. Movants are also requesting relief from the 14-day stay imposed by Fed. R. Bankr. P. 4001(a)(4). Further, Movants are requesting prospective stay relief in the event that the Debtor file any subsequent bankruptcy cases.

4

## ARGUMENT

### A. Pending Litigation Is Cause to Grant Relief from the Automatic Stay

18.     Section 362 of the Bankruptcy Code provides that a court may grant a party in interest relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1). Although "cause" is not defined under the Bankruptcy Code, courts have crafted analyses based on various factors to delineate what constitutes cause for purposes of granting relief from the automatic stay. One of the most straightforward measures of cause is pending litigation in another forum.

19.     Stay relief is permissible in order to allow other court proceedings to conclude. *See In re SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007) ("The legislative history to section 362(d)(1) emphasizes the section's applicability to proceedings in another tribunal. 'It will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from any duties that may be handled elsewhere.'") (citing H.R. Rep. No. 595, 95th Cong., 1st Sess., 341 (1977)); *see also In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990); *In re Murray Industries, Inc.*, 121 B.R. 635, 636 (Bankr. M.D. Fla. 1990) (stating "[w]hether to grant relief from the stay to allow litigation to continue in another forum is within the sound discretion of the Bankruptcy Court.").

20.     The State Court Action has now been pending for nearly two years. The State Court has already resolved the merits in Genesis's favor, granting summary disposition on the breach of contract and conversion claims and holding the Debtor personally liable. The only remaining issue is the final determination of the amount of damages. It is all but certain that if the automatic stay

5

is lifted, the State Court Action would proceed to a prompt resolution of damages based on the pending briefing. Cause exists based on the advanced posture of the State Court Action, alone.

**B. Bad Faith and the Totality of Circumstances Provide Further Cause to Grant Relief**

21. The Eleventh Circuit applies a flexible, fact-specific analysis when determining what constitutes cause to grant relief from the automatic stay under § 362. *See In re Feingold*, 730 F.3d 1268, 1277 (11th Cir. 2013) ("There is no set list of circumstances that a bankruptcy court is required to consider in evaluating whether § 362(d)(1) 'cause' exists to lift the automatic stay. Rather, courts evaluating whether to grant stay relief have looked to a variety of case-specific factors . . ."); *see also In re Ellingsworth Residential Cmty. Assoc., Inc.*, 125 F.4th 1365, 1381 (11th Cir. 2025) ("[C]ourts also consider the totality of the circumstances when determining whether to grant relief from a stay, including 'the benefits and burdens of lifting the stay.'") (citing *In re Gaime*, 17 F.4th 1349, 1355 (11th Cir. 2021)).

22. Factors generally considered include "interference with the bankruptcy, good or bad faith of the debtor, injury to the debtor and other creditors if the stay is modified, injury to the movant if the stay is not modified, and the proportionality of the harms from modifying or continuing the stay." *Feingold*, 730 F.3d at 1277 (citing *Milne v. Johnson (In re Milne)*, 185 B.R. 280, 283 (N.D. Ill. 1995)).

23. The court in *In re Dixie Broadcasting, Inc.*, 871 F.2d 1023, 1027 (11th Cir. 1989), provided a non-exhaustive list of acts that indicate bad faith, including "the timing of the filing of the petition," whether the petition "was filed strictly to circumvent pending litigation," and whether the debtor is "financially distressed." *See also Furness v. Lilienfield*, 35 B.R. 1006 (D. Md. 1983) (petition dismissed which had been filed just prior to district court civil RICO trial after a continuance in the trial had been denied); *In re Wally Findlay Galleries (New York), Inc.*, 36 B.R.

200955254v2

849 (Bankr. S.D.N.Y. 1984) (petition dismissed which was filed the same day judgment entered against debtor in state court).

24.     Applying these factors, there is no question that the Debtor has acted in bad faith. The Debtor filed his first bankruptcy petition just one day before the originally scheduled trial in the State Court Action. After dismissing that case, the Debtor filed the instant petition one day before the rescheduled trial date. Filing a bankruptcy petition for the primary purpose of staying pending litigation is quintessential bad faith. But doing so twice—each time on the eve of a trial date in a case where liability has already been determined—rises to an abuse of the bankruptcy process. The automatic stay is meant to be protective and should not be used as a sword to fight off a judgment for which the Debtor has already been found liable.

25.     The Debtor's bad faith is further demonstrated by the material misrepresentations in his petition, including his false statement under penalty of perjury that he had not previously filed for bankruptcy, and his representation that he filed without the assistance of an attorney.

26.     Bad faith does not become apparent from a snapshot in time. When the Debtor's conduct is viewed in totality, it is apparent that the fraud and misrepresentation that gave rise to the State Court Action—diverting $2.35 million in loan proceeds, wrongfully retaining $572,751.57 in collections, refusing to cooperate with the court-appointed Receiver, and using corporate entities as a "sham" to "subvert justice"—has continued into these bankruptcy proceedings through serial filings, false statements under oath, and manipulation of the automatic stay.

### C. The Balance of Harms Favors Lifting the Stay

27.     The benefits to Debtor's estate and his creditors of granting relief from the stay outweigh the burden placed on the Debtor. A pending lawsuit with an undetermined damages

7

amount that may or may not be dischargeable looms in uncertainty over the estate, which cannot accurately reflect distributions to creditors. Allowing the State Court Action to proceed will help answer both of these questions—the amount owed and the dischargeability of the debt.

28. The burden placed on Genesis by its inability to proceed in the State Court Action is substantial. The State Court has already determined liability and the matter is ready for a final determination of damages. Genesis's claim against the Debtor exceeds $5.7 million. The State Court Action has been pending for nearly two years, and trial has been delayed twice solely as a result of the Debtor's eve-of-trial bankruptcy filings.

29. Moreover, even if the Debtor was able to discharge any judgment against him as part of his bankruptcy, the State Court Action would still need to proceed and be reduced to judgment for purposes of claims allowance and distribution. Any benefit to the Debtor from the automatic stay is therefore minimal, while the burden placed on Genesis—which must wait even longer for a ruling in a case where liability has been conclusively determined—is significant.

30. It is apparent that the Debtor has invoked the automatic stay under Chapter 13 of the Bankruptcy Code without good faith, merely to impair his creditors and delay the resolution of the State Court Action. Therefore, cause exists to allow this Court to grant Movants relief from the automatic stay and allow the State Court Action to proceed.

## CONCLUSION

WHEREFORE, for the reasons set forth herein above, Movants request that this Court enter an order: (1) granting this Motion; (2) granting Movants relief from the automatic stay, pursuant to 11 U.S.C. § 362(d); (3) granting Movants relief from the 14-day stay imposed by Fed. R. Bankr. P. 4001(a)(4); (4) granting Movants prospective stay relief against the Debtor; and (5) any other relief the Court may find is just and reasonable under the circumstances.

8

Dated: June 2, 2026

Respectfully submitted by,

FURR AND COHEN, P.A.
2255 Glades Road, Suite 419A
Boca Raton, Florida 33431
(561) 395-0500
(561) 338-7532 – facsimile

By */s/ Jonathan T. Crane*
Jonathan T. Crane, Esq.
Florida Bar No. 1039351
E-mail: jcrane@furrcohen.com
***Local Counsel for Attorney Michael Pomeranz for Creditors Genesis Alternative Finance IV LLC and Genesis Alternative Finance V LLC***

TAFT STETTINIUS & HOLLISTER LLP

By: */s/ Michael Leo Pomeranz*
Michael Leo Pomeranz (P84908)
27777 Franklin Rd., Suite 2500
Southfield, MI 48034
Tel.: 248-351-3000
mpomeranz@taftlaw.com

9

# EXHIBIT LIST

**Exhibit A:**    Opinion and Order dated February 26, 2026, Genesis Alternative Finance IV LLC et al. v. Lint Chiropractic P.C. et al., Case No. 24-010404-CB (Wayne County Circuit Court)

**Exhibit B:**    Receiver's Report and Recommendation dated March 28, 2025

**Exhibit C:**    Order for Receivership dated January 8, 2025

**Exhibit D:**    Order for Sanctions dated April 7, 2025

200955254v2

## PROOF OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

CM/ECF to all parties listed below on this 2nd day of June 2026.


Dated: June 2, 2026

FURR AND COHEN, P.A.
2255 Glades Road, Suite 419A
Boca Raton, Florida 33431
(561) 395-0500
(561) 338-7532 – facsimile

By */s/ Jonathan T. Crane*
Jonathan T. Crane, Esq.
Florida Bar No. 1039351
E-mail: jcrane@furrcohen.com
***Local Counsel for Attorney Michael
Pomeranz for Creditors Genesis
Alternative Finance IV LLC and Genesis
Alternative Finance V LLC***


**By Notice of Electronic Filing:** All parties registered with CM/ECF to receive electronic notices.

The following is the list of **parties** who are currently on the list to receive email notice/service for
this case.
- **Daryl Smith**    jwflecf@trustee13.com
- **United States Trustee - TPA7/13**    USTPRegion21.TP.ECF@USDOJ.GOV
- **Giselle Velez**    gvelez@raslg.com

200955254v2

EXHIBIT

A

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

GENESIS ALTERNATIVE FINANCE IV LLC,
and GENESIS ALTERNATIVE FINANCE V LLC,

    Plaintiffs,                             Case No. 24-010404-CB

-v-                                          Hon. Annette J. Berry

LINT CHIROPRACTIC, PC, DIAGNOSTIC
CHIROPRACTIC MI, PC, SUPPLIES
PLUS MI, LLC., ROBERT SUPER, and
RICHARD GELLER,

    Defendants.

_____

## OPINION AND ORDER

At a session of said Court held in the Coleman
A. Young Municipal Center, Detroit, Wayne
County, Michigan,   2/26/2026
on this:_____

**PRESENT:** Hon. Annette J. Berry
                        Circuit Judge

This civil matter is before the Court on a motion for summary disposition filed by

Plaintiffs Genesis Alternative Finance IV LLC and Genesis Alternative V LLC

(collectively "Genesis"). For the reasons stated below, the Court grants in part and denies

in part the motion.

### I. BACKGROUND

On July 19, 2024, Genesis filed a complaint against Lint Chiropractic, PC,

Diagnostic Chiropractic MI, PC, Supplies Plus MI, LLC, Robert Super, and Richard

Geller. On August 12, 2025, Plaintiffs filed an amended complaint containing nine counts: (1) Breach of Contract (as to Agreement Regarding Servicing); (2) promissory estoppel (in the alternative to breach of contract); (3) statutory conversion; (4) common law conversion; (5) embezzlement of a security; (6) promise made in bad faith; (7) indemnification and attorneys' fees under the Underlying Agreements; (8) appointment of a receiver; and (9) breach of contract (as to the Underlying Agreements).

Defendants Lint Chiropractic, PC ("Lint") and Diagnostic Chiropractic MI, PC ("Diagnostic") are professional corporations with offices located in Southfield, Michigan. Supplies Plus MI, LLC ("SPM") is a Michigan limited liability company also located in Southfield, Michigan. Lint, Diagnostic, and SPM provide chiropractic services and medical and surgical products to individuals who are injured in automobile accidents and are subject to what is commonly known as the Michigan No-Fault Act, MCL 500.8101, *et seq*, and later bills for those medical and surgical services. Defendant Robert Super is an individual, and principal of Diagnostic, Lint, and Supplies Plus, who resides in Tampa, Florida and conducts business in Wayne County, Michigan. Robert Super is a chiropractor. Defendant Richard Geller is an individual and has been describe as General Counsel for Diagnostic, Lint and Supplies Plus.

By way of background, in 2021, Defendants sought funding from Genesis and Genesis provided Defendants approximately $2.4 million in funding under three agreements: (a) No-Fault Auto Advance Security Agreement between Genesis and Lint, dated May 18, 2021 and September 14, 2021; (b) No-Fault Auto Advance Security Agreement between Genesis and SPM, dated December 9, 2021; and (c) No-Fault Auto

Advance Security Agreement between Genesis and DCM, dated December 9, 2021(collectively, "the Underlying Agreements"). In short, Defendants accepted the funds, pledged security interests, and executed promissory notes.

Under the agreements, Genesis provided advance capital to Defendants, in exchange for which, Defendants assigned to Genesis property rights in and to medical receivables. The receivables are medical bills incurred by Defendants' patients and payable by insurance companies under the No-Fault Act. Defendants provided Genesis a first priority security interest on specific receivables, which are identified in UCC 1s that have been filed. Defendants pursued collection of certain receivables, but failed to pay Genesis what they owe.

Genesis then sued Defendants in a prior case, Case No. 22-013065-CB, seeking repayment of the loan. In that case, the parties entered into an agreement named "Agreement Regarding Servicing" after the Court[1] appointed a receiver. Also, in that case, after the parties stipulated to dissolve the first receivership and temporary restraining order, the parties participated in mediation. After mediation, the Court entered a stipulated order regarding a monthly reconciliation process. The order required that each Defendant deposit all funds collected on any secured account into the specific bank account designated for that Defendant. According to Genesis, Defendants disregarded its required obligations under the Second Interim Stipulated Order. For example, Genesis alleges that Defendants wired $80,000.00 out of the bank account, with no notification to or permission from Genesis. Ultimately, Defendants restored the $80,000 to the account.

---

[1]    Case No. 22-013065-CB was originally presided over by the retired judge, Hon. David A. Groner. That case was then reassigned to this Court.

Thus far, Defendants have only repaid $824,882.07. According to Genesis, Defendants have collected approximately $1.4 million and have retained about $570,000.00, which should have been paid to Genesis pursuant to the Underlying Agreements.

In July 2023, Genesis executed an agreement with Quantum ("Genesis-Quantum Agreement"). Under this agreement, Quantum, as a servicer, began to work with Defendants to service, administer, and collect on the accounts. Defendants represented that they were cooperating with Quantum. Quantum and Defendants (referred to as "Providers") then entered into the above mentioned "Agreement Regarding Servicing." The agreement expressly names Genesis as a third-party beneficiary that is entitled to enforce the terms of the agreement. The agreement also provided that Quantum was permitted to monitor and collect outstanding amounts owed by Defendants under the Underlying Agreements. The Agreement Regarding Servicing obligates Defendants to provide reconciliation reports and settlement statements. According to Genesis, with the Agreement Regarding Servicing in place along with Defendants' apparent cooperation, the parties agreed to dismiss the prior case. The Court entered a stipulated order dismissing the case without prejudice.

The instant action again arises out of the loan made by Genesis to Defendants in the amount of $2.4 million. It essentially is a claim regarding Defendants' failure to abide by the Agreement Regarding Servicing. The Agreement Regarding Servicing provides in pertinent part:

> 2. Without limitation of, or modification or waiver of, any of the terms or provisions of the Transaction Documents …Providers hereby acknowledge and agree as follows:

(a) Each Provider shall ensure that Servicer has access to its billing systems…

(b) <u>Each Provider shall cause all Collections to be remitted directly to the Bank Account, and shall not deposit or at any time comingle the same with any other funds of Providers.</u> Each Provider shall provide Servicer and Genesis at all times with real-time view-access to the Bank Account. Distributions from the Bank Account shall only be made once Servicer, on behalf of Genesis, has provided written disbursement instructions to Providers setting forth Servicer's approval of the Collections Reconciliation Report and the amounts and manner in which such Collections should be disbursed ("Distribution Confirmation"). …

(c) Each Provider shall provide to Servicer and Genesis, on or before the fifteenth (15th) day of each month, and consistent with the Order, a full Collection Reconciliation Report identifying all Collections received by Providers during the immediately preceding month in respect of the Secured Receivables.

\*\*\*

(e) Within five (5) business days of any settlement of a Claim, Providers shall send to Servicer and Genesis a full and complete settlement statement from the applicable Claims Counsel…

\*\*\*

5. This Agreement shall be binding upon and inure to the benefit of Servicer, Providers and their respective successors and assigns; provided, however, that <u>Genesis shall be an express third-party beneficiary of this Agreement and shall be entitled to enforce there (sic) terms hereof</u> …

\*\*\*

8. <u>SERVICER AND EACH PROVIDER HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY</u> IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

[Plaintiffs' Motion, Exhibit 7] [Emphasis added].

In addition, in this case, the Court entered an order appointing Charles D. Bullock as receiver. The Court's order provided in relevant part:

- Genesis has demonstrated at least an apparent right, title, or interest in certain accounts receivable held by Defendants

- Genesis has demonstrated that some or all of those accounts or their revenue-producing potential appear to be in danger of waste, loss, dissipation, or impairment

[Plaintiffs' Motion, Exhibit 8].

The Court's order also provided in relevant part:

A. Defendants will execute and either will send or will cause to be sent letters of direction to all collections counsel substantially in the form of Exhibit 1 to this Order.

***

C. Any disagreement concerning amounts due to Plaintiffs will not excuse payment of undisputed amounts.

[Id] [Emphasis added].

Receiver Bullock issued his report on March 28, 2025. His relevant findings included the following:

### Introduction

The loan advances never remained in the Defendants' accounts for more than a few days. Rather, the Defendants made transfers out of their respective bank accounts, either the same day, or in close proximity to, the date Plaintiffs advanced the funds. When questioned regarding these transfers, Dr. Super identified the recipients all as entities he owned and controlled. Further, in support of the alleged "management fees," Dr. Super provided only two management service agreements -- both of which lacked financial terms and both of which show Dr. Super on both sides of the transaction.

***

18. The Receiver discussed each of the files with Dr. Super and representatives Genesis, and …both parties agreed as to the amounts advanced by Genesis and the remaining principal balance of the loan amounts outstanding.

\*\*\*

20. The Receiver's analysis shows that GAF V advanced approximately $2.1 million to Defendants and GAF IV advanced approximately $300,000 solely to Lint Chiropractic, for a total of approximately $2.4 million. The amount of these advances were (sic) verified via a review of Defendants' bank statements and detailed general ledgers, as well as transaction dates and banking information provided by Genesis

21. To date, Defendants have collected approximately $1.4 million related to the subject suits, of which, approximately $870,000 has been remitted to Genesis and approximately $570,000 has been retained by the Defendants. <u>Based on the forgoing, the remaining principal balance owed to Genesis, exclusive 0f any agreed upon returns, is approximately $1.5 million.</u>

\*\*\*

24. When the Receiver requested copies of bank statements to corroborate this position, Dr. Super refused to provide them, claiming that the request was outside of the purview of the instant litigation.

25. … <u>The Receiver is of the firm belief that Dr. Super's refusal to provide the requested bank statements is to shield further discovery by the Receiver regarding the substantial transfers made from the Defendants to MI Medical Management.</u>

26. … there is no record of a loan amount due to Genesis in either the Defendants' detailed general ledgers or tax returns. Rather (and remarkably), the <u>Defendants' recorded Genesis' advances as "Business Income" in their books and records, rather than a loan.</u>

27. In sum, it appears the parties are in agreement regarding the data included in the Accounting Criteria and that Genesis is owed no less than $1.5 million …

c. ***The Defendants are unlikely to satisfy the debts owed to Genesis from collections***

\*\*\*

29. Defendants' collective cash balance in their respective checking and savings accounts totaled $3,776.70 as 0f January 31, 2025, and was deemed to be immaterial for purposes of assessing Defendants' ability to repay the subject Genesis loans.

\*\*\*

30. The primary remaining assets held by the Defendants consist of a face value of approximately $5.1 million of active collection suits filed by various law firms; however, collectability is suspect. Indeed, numerous insurance companies have filed lawsuits against Defendant Lint Chiropractic alleging it submitted fraudulent, unlawful, and/or excessive insurance claims for services to Michigan auto accident victims.

31. Since the entry of the Receivership Order on January 8, 2025, Genesis has only received $17,535.00 in the lockbox account ordered pursuant to such order.

\*\*\*

34. Given the foregoing, the Defendants are unable to satisfy debts owed to Genesis from simply collection of outstanding receivables.

d. ***Defendants transferred nearly all of the Genesis loan proceeds to insiders***

36. **Based upon the Receiver's review, of the $2.38 million of loan proceeds advanced by Genesis, $2.35 million was transferred out from the Defendants to other Super related entities or to Dr. Super personally.**

37. The loan advances never remained in the Defendants' accounts for more than a few days. Rather, the Defendants

8

made transfers out of their respective bank accounts, either the same day, or in close proximity to, the date Genesis advanced the funds. According to the Defendants' detailed general ledgers, the transfers out were recorded as an expense for "Management Fees/Services" and the funds were primarily sent to MI Medical Management and Medical Capital Solutions accounts at JP Morgan Chase bank (accounts ending 7072/9899 and 3028, respectively).

***

39. When the Receiver requested Dr. Super produce copies of the bank statements for the recipient entities, Dr. Super refused.

40. It is clear from the Profit and Loss Statements that the Defendants transferred the majority of amounts reported as income to other entities owned and/or controlled by Dr. Super and recorded such transfers as an expense item labeled "Management Fees/Services."

41. In support of the alleged "management fees," Dr. Super provided two management service agreements. The first agreement was between Lint Chiropractic, P.C., MI Medical Management, LLC and Diagnostic Chiropractic, P.C. The second agreement was between Lint Chiropractic, P.C., MI Medical Management, LLC. and Lint Chiropractic II, P.C. Both agreements appeared to be identical and contained sections regarding management fees, however the terms and amounts were blank. In addition, Dr. Super executed both agreements on behalf of all the entities involved and, when interviewed by the Receiver, confirmed that all of these entities are owned and controlled by him and stated that the entities "were" him.

42. Notably, management services agreements were not provided to support management fees paid to Medical Capital Solutions, and no agreements were produced related to Supplies Plus MI, LLC.

### RECOMMENDATION AND CONCLUSION

The Receiver believes that it is appropriate that the Court order the expansion of his powers in order to assume full control of the Defendants' assets and to pursue claims against third parties in order to recover fraudulent transfers and/or any other claims in law or equity available. The Defendants

simply have no hope of repaying the funds they readily admit owing to the Plaintiffs.

[Plaintiffs' Motion, Exhibit 20] [Italics and bold type in original] [Underlining added].

Discovery in this case closed on April 11, 2025. Depositions of Bianca Dhall, Lint's last and sole employee of Ml Medical Management, and Defendant Dr. Super were taken. Both Dr. Super and Geller have submitted affidavits. Now before the Court is Genesis' motion for summary disposition in regard to: (1) the breaches of contract; (2) unjust unrichment (in the alternative to breach of contract); (3) statutory conversion; (4) common law conversion; and (5) embezzlement of a security.

## II. STANDARDS FOR DETERMINING MOTIONS FOR SUMMARY DISPOSITION

Plaintiffs base their motion on MCR 2.116(C)(10). "'A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint.'" *Marion v Grand Trunk W R Co*, 513 Mich 220; 15 NW3d 180, 184 (2024), quoting *Maiden v Rozwood*, 461 Mich. 109, 120, 597 N.W.2d 817 (1999). In reviewing a motion under MCR 2.116(C)(10), a court must consider the pleadings, admissions, affidavits, and other relevant documentary evidence submitted in the light most favorable to the nonmoving party. *Corley v Detroit Bd of Ed*, 470 Mich 274, 278; 681 NW2d 342 (2004). If no genuine issue of material fact is established, the moving party is entitled to judgment as a matter of law. *Maiden, supra* at 120. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v General Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

The moving party has the initial burden of supporting its position through documentary evidence. *Quinto v Cross and Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). The burden then shifts to the opposing party to establish the existence of a genuine issue of material fact. *Id.* The non-moving party "... may not rest on the mere allegations or denials of his or her pleadings, but must, by affidavit or otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial." MCR 2.116 (G)(4). If the opposing party fails to do so, the motion for summary disposition is properly granted. Id.; *Quinto, supra* at 363. Finally, a "reviewing court may not employ a standard citing the mere possibility that the claim might be supported by evidence produced at trial. A mere promise is insufficient under our court rules." *Maiden, supra* at 121.

### III. <u>DISCUSSION</u>

In support of the motion, Genesis first argues that Defendants breached both the Underlying Agreements and the Agreement Regarding Servicing. The only responsive argument put forth by Defendants is that the "initial documents executed by and between the parties contained a NON-RECOURSE provision and that Plaintiffs were only obligated to pay "once certain identified cases came to fruition…" Defendants argue that this is a condition precedent for Defendants' obligation to pay on the accounts receivable.

In the Court's view, Defendants' response fails to address the fact that Defendants received $1.2 million in collectibles, yet paid only approximately $870,000 to Genesis. Moreover, as Genesis argues, "although 'non-recourse' language appears in the title of certain Security Agreements, it does not appear within the Promissory Notes." A "nonrecourse loan is a loan where the lender has agreed to limit its remedies (or recourse)

11

in the event of a loan default to foreclosure on the real and/or personal property collateral pledged by the borrower as security for the loan." Shelby D. Green, Joseph (Joey) E. Lubinski, (FNa2) James (Jim) C. Wine (FNa3), *NEGOTIATING NONRECOURSE CARVEOUT GUARANTIES*, Prac Real Est Law 18, 19 (2022). Thus, the security agreements in this case are nonrecourse, meaning that Genesis has no ability to foreclose on the accounts receivable, which secure the loan, (No-Fault cases), but may seek remedies from Defendants' other assets. See LOAN, Black's Law Dictionary (12th ed. 2024) ("**nonrecourse loan** (1941) A secured loan that allows the lender to attach only the collateral, not the borrower's personal assets, if the loan is not repaid." [Emphasis in original]). On the other hand, the promissory notes dictate the terms for repayment of the loan and consequences of default.

"'A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach.'" *Zwiker v Lake Superior State Univ*, 340 Mich App 448, 477-478; 986 NW2d 427 (2022), quoting *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014).

Here, Dr. Super's affidavit merely mirrors Defendants' argument. He stated in pertinent part:

> 4. That at no time did I commit any acts, or undertake any attempts, to defraud the plaintiff of any monies rightfully due under the existing corporate contracts.
>
> 6. The public record Plaintiffs created by fiing of the initial bogus Complaint served to destabilize Defendants business operations; ...
>
> 8. "That the: initial documents executed by and between the parties contained a NON- RECOURSE provision and

obligated Defendants to pay Plaintiffs pursuant to the Agreement only once certain identified cases came to fruition regarding payment.

11. That despite the decreased revenue caused in large measure by the actions of Plaintiffs, Defendants' overhead expenses continued. The delay in insurance payments, coupled with actual denials, forced Defendants to abandon operations in Michigan.

12. That Defendant's corporate entities breached no agreements. …

[Affidavit of Defendant Super].

Dr. Super essentially blames Genesis' actions for Plaintiffs' lack of revenue. He contends that the cases initiated against Defendants in attempts to collect their debt has caused their lack of revenue. Dr. Super also contests the accuracy of Genesis' damage calculations. He claims it to be approximately $1.3 million.

Geller's affidavit offers nothing more. He merely disclaims any ownership of, control of, directorship of, or leadership role in Defendant entities. He also explains that he is General Counsel for Defendants. He asserts that he "never assumed or been assigned any personal liability in connection with the matters alleged in this case, nor [has he] entered into any personal guarantees or agreements relating to the claims asserted." He also said that he "had no access to any of the bank accounts, QuickBooks or any financial information, nor did [he] ever have any involvement in payroll."

Dr. Super also testified in a deposition that he formed MI Medical Management as a management company and he would transfer money in and out of that company's accounts to make payroll and pay for certain of his personal expenses such as his health and auto insurance, his phone bill, and his car lease.

13

As this Court has already determined, "Genesis has demonstrated at least an apparent right, title, or interest in certain accounts receivable held by Defendants" and "Genesis has demonstrated that some or all of those accounts or their revenue-producing potential appear to be in danger of waste, loss, dissipation, or impairment." This was confirmed by Receiver Bullock. Bullock opined that , "it appears the parties are in agreement regarding the data included in the Accounting Criteria and that Genesis is owed no less than $1.5 million." As indicated above, Bullock found the following:

> 25. … The Receiver is of the firm belief that Dr. Super's refusal to provide the requested bank statements is to shield further discovery by the Receiver regarding the substantial transfers made from the Defendants to MI Medical Management.
>
> ***d. Defendants transferred nearly all of the Genesis loan proceeds to insiders***
>
> 36. **Based upon the Receiver's review, of the $2.38 million of loan proceeds advanced by Genesis, $2.35 million was transferred out from the Defendants to other Super related entities or to Dr. Super personally**.
>
> 37. The loan advances never remained in the Defendants' accounts for more than a few days. Rather, the Defendants made transfers out of their respective bank accounts, either the same day, or in close proximity to, the date Genesis advanced the funds. According to the Defendants' detailed general ledgers, the transfers out were recorded as an expense for "Management Fees/Services" and the funds were primarily sent to MI Medical Management and Medical Capital Solutions accounts at JP Morgan Chase bank (accounts ending 7072/9899 and 3028, respectively).
>
> [Plaintiffs' Motion, Exhibit 20] [Italics and bold type in original].

Bullock concluded "it is appropriate that the Court order the expansion of his powers in order to assume full control of the Defendants' assets and to pursue claims

against third parties in order to recover fraudulent transfers and/or any other claims in law or equity available. The Defendants simply have no hope of repaying the funds they readily admit owing to the Plaintiffs." [Id]. The Court agrees with Receiver Bullock and Defendants have provided no factual predicate for its argument against Genesis other than to blame litigation for their failure to generate revenue and repay their loan to Genesis. Defendants have breached both the Underlying Agreements and the Agreement Regarding Servicing. The only issue left to decide regarding these breaches is amount of damages incurred as a result of the breaches. As Bullock reported, the parties agree that the amount owing to Genesis is $1.5 million. Therefore, there is no genuine issue of material fact that Defendants breached the Underlying Agreements.

The Underlying Agreements related to Diagnostic, and Supplies Plus were executed on December 9, 2021 and the Agreement related to Lint was executed on May 18, 2021. In all, there were 13 promissory notes. Thus, under these agreements, Defendants agreed to pay Genesis all "Return Amounts" by March 9, 2023. The "Return Amounts" and the amounts prescribed in the promissory notes. The "Return Amount" under the promissory notes is the principal amount X 1.8, except that the Supplies Plus promissory note dated May 13, 2022 provides for a return amount of 1.5 X the principal amount.

Defendants failed to pay Genesis all "Return Amounts" within the 15-month contractual window. Defendants have only paid Genesis $824,882.07. Genesis contends that, due to its right to accelerate the amounts due, it is entitled to $5,165,133.98, which is the total of all the agreements. Indeed, the promissory notes provide that, in the event

15

of default, Genesis may accelerate all amounts due. [Plaintiffs' Motion, Exhibit 5, Underlying Agreements, Promissory Notes, ¶ 5].

There is also no doubt that Defendants failed to follow the directives of the Agreement Regarding Servicing. They removed funds from the bank account without permission, commingled the funds with their own, and failed to provide monthly Reconciliation Reports.

Defendants have failed to provide sufficient evidence to overcome Genesis' motion for summary disposition. Accordingly, the Court grants Plaintiffs' motion with respect to the breaches of contract claims. The Court will also issue a separate order to expand the receiver's powers in order to satisfy the debt owed to Genesis.

Genesis next argues that the Court should pierce the corporate veil because "Super and Geller Abused the Corporate Form of the Defendant Entities." In response, Defendants contend that Dr. Super and Geller cannot be personally liable because "neither party participated in the underlying contractual negotiations in their individual capacities, nor did they personally execute any agreements that would create individual liability." They claim that "all interactions and agreements at issue were undertaken solely by the corporate defendants." Defendants further argue that Geller should be dismissed from the case because he is not an owner of any of the defendant entities and is merely general counsel for them.

"There is a presumption that the" corporate veil "may be pierced only where an otherwise separate corporate existence has been used to subvert justice…" [Footnotes omitted] 6 Mich Civ Jur Corporations § 11. "For the corporate veil to be pierced, the corporate entity must be a mere instrumentality of another individual or entity. Further,

16

the corporate entity must have been used to commit a wrong or fraud. Additionally, and finally, there must have been an unjust injury or loss to the plaintiff." [Emphasis added] *Rymal v Baergen*, 262 Mich App 274, 293- 294; 686 NW2d 241 (2004).

"The traditional basis for piercing the corporate veil has been to protect a corporation's creditors where there is a unity of interest of the stockholders and the corporation and where the stockholders have used the corporate structure in an attempt to avoid legal obligations." *Foodland Distributors v Al-Naimi*, 220 Mich App 453, 456; 559 NW2d 379 (1996). "There is no single rule delineating when the corporate entity may be disregarded." *Id.* "Whether the veil should be pierced is an equitable determination that must be made after considering the 'entire spectrum of relevant facts.'" *Grand Rapids Assoc Ltd Partnership v Coop Props, LLC*, 495 Fed Appx 598, 601 (CA 6, 2012), quoting *Foodland Distributor*s at 380.

The factors used by courts to determine the propriety of piercing the corporate veil include: (1) whether the corporation is undercapitalized; (2) whether separate books are kept; (3) whether there are separate finances for the corporation; (4) whether the corporation is used for fraud or illegality; (5) whether corporate formalities have been followed; and (6) whether the corporation is a sham. *Glenn v TPI Petroleum, Inc*, 305 Mich App 698, 716; 854 NW2d 509 (2014).

The evidence in this case demonstrates that Dr. Super used the corporate form to "subvert justice." *Rymal, supra*. The record shows that no corporate formalities were followed. There were no boards, meetings or officers. Dr. Super testified that money received by the defendant entities were quickly transferred into MI Medical Management and money was used to pay Dr. Super's personal expenses, such as his phone bill and his

personal car lease. This was confirmed by Receiver Bullock's report. Biance Dhall, the only employee of MI Medical Management testified that, although checks were received on certain accounts, she had no idea whether and what bank accounts the defendant entities existed. She said that only Dr. Super knew about them. She also said that she was not aware of any board meetings, officers, or corporate organizational documents for any of the defendant companies. It was clear from her testimony that only Dr. Super knew about the receipt of monies and their eventual destination. She stated that, as of August 2, 2024, all chiropractic services had ceased and that the offices were cleared of all tangible assets. The cessation of services was due to the law changing in Michigan and that payments for insurance related services were significantly reduced.

As the Receiver reported, "Defendants transferred nearly all of the Genesis loan proceeds to insiders" and "$2.35 million was transferred out from the Defendants to other Super related entities or to Dr. Super personally." [Plaintiffs' Motion, Exhibit 20]. The Receiver also reported that Dr. Super refused to produce bank statements for the entities that received the loan funds. The Receiver also reported that the entities' collective bank accounts as of January 31, 2025 only had a cash balance of $3,776.70.

In the Court's view, because Dr. Super has failed to overcome his burden to produce evidence to contradict Genesis' claim and that most of the factors indicate that Dr. Super's corporations have been used to subvert justice, that no corporate formalities have been followed, that the entities were undercapitalized, and that the defendant entities are a sham, there is no question of material fact that the defendant entities are mere instrumentalities of Dr. Super. Accordingly, the corporate veil should be pierced, holding Dr. Super personally liable for the amount due. As to Defendant Geller, there is no

18

indication that he controlled any of the defendant entities other than to help Dr. Super in forming them. Thus, he should not be included as a person liable for the outstanding loan proceeds.

Genesis' third argument is that the defendant entities have been unjustly enriched[2] by retaining $377,698.24 in funds taken from a bank account. Notably, Defendants have failed to address this argument. Any argument Defendants may have had is deemed abandoned. *Schellenberg v Rochester Elks*, 228 Mich App 20, 49; 577 NW2d 163 (1998).[3]

"Unjust enrichment is defined as the unjust retention of money or benefits which in justice and equity belong to another. No person is unjustly enriched unless the retention of the benefit would be unjust." *Tkachik v Mandeville*, 487 Mich 38, 47–48; 790 NW2d 260 (2010) [Internal citations and quotation marks omitted]. "The elements of a claim for unjust enrichment are (1) receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to plaintiff from defendant's retention of the benefit." *Bellevue Ventures, Inc v Morang-Kelly Inv, Inc*, 302 Mich App 59, 64; 836 NW2d 898 (2013), citing *Dumas v Auto Club Ins. Ass'n*, 437 Mich 521, 546; 473 NW2d 652 (1991). "[T]he law operates to imply a contract in order to prevent unjust enrichment." *Id* [Citation omitted]. "However, a contract will be implied only if there is no express contract covering the same subject matter." *Belle Isle Grill Group v Detroit*, 256 Mich App 463, 478; 666 NW2d 271 (2003).

---

[2] As Genesis notes, the Amended Complaint incorrectly labels Genesis' unjust enrichment claim as a claim for promissory estoppel.

[3] **Error! Main Document Only.**A party may not merely announce his or her position and leave it to the Court to discover and rationalize the basis for his or her claims, nor may he or she give issues only cursory treatment with little or no citation of supporting authority. *People v Matuszak*, 263 Mich App 42, 59; 687 NW2d 342 (2004). Such cursory treatment constitutes abandonment of the issue. *Id.*

Whether a specific party has been unjustly enriched is generally a question of fact. *Morris Pumps v Centerline Piping, Inc*, 273 Mich App 187, 193; 729 NW2d 898 (2006). "However, whether a claim for unjust enrichment can be maintained is a question of law…" *Id.* Moreover, as indicated in *Peabody v DiMeglio,* 306 Mich App 397, 408; 856 NW2d 245 (2014): "This is a purely equitable claim that is not covered by any express contract of the parties." [Citation omitted].

Here, the parties' dispute is covered by express contracts, the Underlying Agreements and the Agreement Regarding Service. The subject matter of these contracts covers the loans, the loans' terms, and the method of repayment. Thus, as a matter of law, unjust enrichment is not a viable claim. Accordingly, the Court denies Genesis' motion as to unjust enrichment.

Genesis' fourth argument is that Defendants' improper withdrawal and retention of funds constitutes common law and statutory conversion. Again, Defendants have failed to address this argument. Any argument Defendants may have had is deemed abandoned. *Schellenberg, supra.*

"[T]he scope of a common-law conversion is now well-settled in Michigan law as any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines & Equip, Inc v Columbian Distribution Servs., Inc,* 497 Mich 337, 351–352; 871 NW2d 136 (2015) [Internal quotation marks, footnotes, and citation omitted]. "'Conversion,' both at common law and under statute, is defined as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Magley v M & W Inc,* 325 Mich App 307; 926 NW2d 1 (2018). The court in *Aroma Wines & Equip,*

*Inc, supra,* quoting *Thoma v Tracy Motor Sales, Inc,* 360 Mich. 434, 438; 104 NW2d 360 (1960), quoting 1 Restatement, Torts, § 222., noted that "'the ways in which a conversion may be committed: 'A conversion may be committed by

> (a) <u>intentionally dispossessing another of a chattel</u>,
> (b) intentionally destroying or altering a chattel in the actor's possession,
> (c) using a chattel in the actor's possession without authority so to use it,
> (d) <u>receiving a chattel pursuant to</u> a sale, <u>lease</u>, pledge, gift or other transaction <u>intending to acquire for himself</u> or for another <u>a proprietary interest in it</u>,
> (e) disposing of a chattel by sale, lease, pledge, gift or other transaction intending to transfer a proprietary interest in it,
> (f) misdelivering a chattel, or
> (g) <u>refusing to surrender a chattel on demand</u>.'''
>
> [Footnotes omitted][Emphasis added].

Additionally, the court in *Magley, supra,* at 314-315, quoting *Foremost Ins Co v Allstate Ins Co,* 439 Mich 378, 391; 486 NW2d 600 (1992) explained: "'Conversion is an intentional tort in the sense that the converter's actions are willful'" The *Magley* court also stated that "Good faith, mistake, and ignorance are not defenses to a claim of conversion." *Id* [Citations omitted].

As to statutory conversion, MCL 600.2919a provides in pertinent part:

> (1) <u>A person damaged as a result of either or both</u> of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> (a) <u>Another person's stealing or embezzling property or converting property</u> to the other person's own use.
> . . .
>
> (2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.
>
> MCL 600.2919a [Emphasis added].

Thus, unlike common law conversion, an added component in statutory conversion is that a person converting property must convert the property for his or her "own use." Case law indicates that "someone alleging conversion to the defendant's 'own use' under MCL 600.2919a(1)(a) must show that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Aroma Wines, supra* at 359. Hence, "own use" may include a use for a purpose which is not the "ordinarily intended purpose."

Defendants have failed to offer any evidence to rebut the evidence provided by Genesis that they improperly withdrew funds and retained those funds. Hence, they have failed to satisfy their burden to establish the existence of a genuine issue of material fact. *Quinto, supra,* and ". . . may not rest on the mere allegations or denials of his or her pleadings, but must, by affidavit or otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial." MCR 2.116 (G)(4).

Because Defendants have not established the existence of a genuine issue of material fact, *Quinto, supra,* and cannot rest on mere denials "judgment, if appropriate, shall be entered against" them. MCR 2.116 (G)(4). Accordingly, the Court grants summary disposition in favor of Genesis as to the conversion claims.

Genesis' last contention is that Defendants embezzled a security. In support, Genesis cites the criminal statute, specifically MCL 750.174. Defendants provide no response to Genesis regarding embezzlement. However, the Court notes that Genesis' embezzlement claim cannot lie.

There is no separate civil cause of action for embezzlement in Michigan. Michigan courts treat embezzlement as a specific form of conversion rather than as a distinct civil tort. As noted in

the recent case, *Marko Law, PLLC v Salling*, __Mich App__; __ NW3d__; 2025 WL 3180006 (2025) at 4 "stealing and embezzling are simply specific forms of conversion." The Marko Law court explained:

> Embezzlement is defined as criminally converting property to one's own use, MCL 750.174(1), and any act of stealing property likewise involves an "act of domain wrongfully exerted over another's personal property." As a result, the statute's reference to stealing, embezzling, or converting property is best understood as a stylistic redundancy familiar in legal drafting…not as a substantive expansion of liability. Reading it otherwise would mean that the Legislature not only provided a damages enhancement but also implicitly created new civil causes of action for "stealing" and "embezzling" without defining their elements or remedies.
>
> [Footnote omitted].

Thus, Michigan's embezzlement law in MCL 750.174 establishes embezzlement as a purely criminal offense with no civil remedy provisions. MCL 750.174 contains no language creating civil causes of action, damage remedies, or private enforcement rights. Therefore, there is no separate civil cause of action for embezzlement. Embezzlement is merely a specific form of conversion as provided in MCL 600.2919a(1)(a). Because the Court has already granted summary disposition in favor of Genesis as to the conversion claims, it denies summary disposition as to the embezzlement claim as moot.

## IV. <u>CONCLUSION</u>

There is no genuine issue of material fact that Defendants breached the Underlying Agreements and the Agreement Regarding Servicing. The Court grants summary disposition in favor of Genesis as to the breach of contracts claims.

There is no question of material fact that the defendant entities are mere instrumentalities of Dr. Super to subvert justice. *Rymal, supra.* Accordingly, the corporate veil should be pierced, holding Dr. Super personally liable for the amounts due. As to

Defendant Geller, there is no indication that he controlled any of the defendant entities and there is no evidence that he controlled the entities. Thus, Defendant Geller should not be included as a person liable for the outstanding loan proceeds.

The unjust enrichment claim is an equitable claim covered by express contracts, the Underlying Agreements and the Agreement Regarding Servicing. *Peabody, supra.* Thus, as a matter of law, unjust enrichment is not a viable claim. Accordingly, the Court denies Genesis' motion as to unjust enrichment.

As to the conversion claims, Defendants have not established the existence of a genuine issue of material fact, *Quinto, supra,* and cannot rest on mere denials. Thus, judgment is appropriate and shall be entered against them. MCR 2.116 (G)(4). Therefore, the Court grants summary disposition in favor of Genesis as to the conversion claims.

There is no separate civil cause of action for embezzlement in Michigan. Michigan courts treat embezzlement as a specific form of conversion rather than as a distinct civil tort. *Marko Law, supra.* There are no private enforcement rights contained in MCL 750.174. Nor does the statute create a civil cause of action. Therefore, as matter of law, the Court denies Genesis' motion as to the embezzlement claim.

For the reasons stated in the foregoing Opinion,

**IT IS ORDERED** that the motion for summary disposition filed by Plaintiffs Genesis Alternative Finance IV LLC and Genesis Alternative Finance V LLC is **GRANTED** as to the claims for breach of contract (Counts I and IX);

**IT IS ORDERED** that the motion for summary disposition filed by Plaintiffs Genesis Alternative Finance IV LLC and Genesis Alternative Finance V LLC is

24

**GRANTED** as to the claims for statutory conversion and common law conversion (Counts III and IV);

**IT IS FURTHER ORDERED** that the motion for summary disposition filed by Plaintiffs Genesis Alternative Finance IV LLC and Genesis Alternative Finance V LLC is **DENIED** as to the claim for unjust enrichment (Count II – Promissory Estoppel);

**IT IS FURTHER ORDERED** that the motion for summary disposition filed by Plaintiffs Genesis Alternative Finance IV LLC and Genesis Alternative Finance V LLC is **DENIED** as to the claim for embezzlement of a security (Count V);

**IT IS FURTHER ORDERED** that Defendant Robert Super shall be held personally liable for the damages sought herein;

**IT IS FURTHER ORDERED** that Defendant Richard Geller is not held to be personally liable for the damages sought herein;

**IT IS FURTHER ORDERED** that the parties shall submit briefs as to the amount of damages within 3 weeks of the date of entry of this Order, after which the Court will determine the correct amount of damages due to Plaintiffs.

**IT IS FURTHER ORDERED** that Receiver Charles D. Bullock will be reappointed with expanded powers under a separate Order after the Court has made a determination as to the damage amount;

**IT IS FURTHER ORDERED** that this **DOES NOT RESOLVE** the last pending claim or issue and **DOES NOT CLOSE THE CASE.**

/s/ Annette J. Berry
February 26, 2026

**DATED:** 2/26/2026

Circuit Judge

25

EXHIBIT

B

**STATE OF MICHIGAN**
**IN THE BUSINESS COURT FOR THE COUNTY OF WAYNE**

GENESIS ALTERNATIVE FINANCE LLC,
and GENESIS ALTERNATIVE FINANCE V LLC,

Case No. 24-010404-CB
Hon. Annette J. Berry

        Plaintiffs,

v.

LINT CHIROPRACTIC P.C., DIAGNOSTIC
CHIROPRACTIC MI, P.C., and SUPPLIES
PLUS MI, LLC,

        Defendants.

| | |
|---|---|
| Taft Stettinius & Hollister, LLP<br>Michael Leo Pomeranz (P84908)<br>Kenneth I. Nelson (P87217)<br>Attorneys for Plaintiffs<br>27777 Franklin Road, Suite 2500<br>Southfield, MI 48034<br>(248) 351-3000<br>mpomeranz@taftlaw.com<br>knelson@taftlaw.com | Law Offices of Gregory J. Rohl PC<br>Gregory J. Rohl (P39185)<br>Attorneys for Defendants<br>4051 Haggerty Rd<br>West Bloomfield, MI 48323<br>(248) 380-9404<br>greg@rohllaw.com |

Stevenson & Bullock, P.L.C
Charles D. Bullock (P55550)
*Receiver*
Elliot G. Crowder (P76137)
*Counsel for Receiver*
26100 American Drive, Suite 500
Southfield, MI 48034
Phone: (248) 354-7906
Facsimile: (248) 354-7907
Email: cbullock@sbplclaw.com
Email: ecrowder@sbplclaw.com

**RECEIVER'S REPORT AND RECOMMENDATION**

        NOW COMES Charles D. Bullock, the Court-appointed Receiver in the above captioned

matter (the "Receiver"), who submits the following as his Report and Recommendation (the

"Report"). This Report shall serve as an overview and update of the matters that the Receiver has

1

Document received by the MI Wayne 3rd Circuit Court.

been appointed by the Court to address his findings and his recommended course of action going forward. This Report is furnished pursuant to the *Order for Receivership and Other Relief* dated January 8, 2025 (the "Receivership Order"). See, **Exhibit A**.

## Introduction

The Receiver has faithfully discharged his duties since the commencement of the instant receivership. The Receivership Order appointed the Receiver to, *inter alia*, prepare and file this Report and Recommendation in order to provide guidance and clarity to the Court. In some instances, the Receiver's efforts were fruitful. In others, the Defendants and their principal impaired the Receiver's efforts and thereby, the ability to provide clarity. What is clear, however, is:

➢ There is approximately $1.5 million due and owing to the Genesis Alternative Finance, LLC and Genesis Alternative Finance V LLC (collectively, "Genesis" or the "Plaintiffs");

➢ There are avoidable transactions from the Defendants that need to be pursued. Indeed, at nearly every turn, following Plaintiffs' funding, the Defendants transferred funds to other entities owned and controlled by their principal, Dr. Robert Super ("Super"). These transfers total no less than $2.3 million and, in many circumstances, were made on the same day that funding was received. Below is a snapshot of just *some* of the banking activity for the days when loan proceeds were received by the Defendants:

| Date | Genesis Fund | Defendant Entity | Defendant Bank | Defendant Bank Account Ending | Genesis Advance Amount | Defendant Transfers | Timing of Defendant Transfers | Notes regarding Defendant transfers out of bank account |
|---|---|---|---|---|---|---|---|---|
| 3/28/2022 | GAF V | Lint | Fifth Third | 4807 | $ 124,675.00 | $ (124,000.00) | Same Day | On 3/28/22 $124,000 was transferred to Medical Capital Solutions labeled as "Management Services" expense. |
| 3/28/2022 | GAF V | Diagnostic | JP Morgan Chase | 6151 | $ 67,200.00 | $ (67,200.00) | Same Day | On 3/28/22 $67,200 was transferred to Medical Capital Solutions account ending '3028 labeled as "Management Fees" expense. |
| 5/19/2022 | GAF V | Lint | Fifth Third | 4807 | $ 337,622.95 | $ (335,000.00) | Same Day | On 5/19/22 $335,000 was transferred to Medical Capital Solutions labeled as "Management Services" expense. |
| 5/19/2022 | GAF V | Supplies | JP Morgan Chase | 5012 | $ 94,800.00 | $ (80,000.00) | Same Day | On 5/19/22 $80,000 was transferred to Medical Capital Solutions account ending '3028 labeled as "Management Fees" expense. |
| 6/21/2022 | GAF V | Diagnostic | JP Morgan Chase | 6151 | $ 206,520.00 | $ (206,000.00) | Same Day | On 6/21/22 $206,000 was transferred to Medical Capital Solutions account ending '3028 labeled as "Management Fees" expense. |
| 7/26/2022 | GAF V | Lint | Fifth Third | 4807 | $ 283,962.58 | $ (283,000.00) | Same Day | On 7/26/22 $200,000 was transferred to Medical Capital Solutions labeled as "Management Services" expense and $83,000 was transferred to Lint Chiropractic JP Morgan Chase account ending '0000. Three days later on 7/29/22 Lint Chiropractic JPMorgan Chase account ending '0000 transferred $100,000 to account ending '9899 which is Medical Management. |

2

Document received by the MI Wayne 3rd Circuit Court.

➢ When the Receiver requested further detail and documentation from the Defendants and Super regarding such transfers, Super and the Defendants refused to cooperate;

➢ The prospects of recovery of Defendants' accounts receivable is speculative and, at best, still is insufficient to satisfy Plaintiffs' claim; and

➢ Defendants' financial records are unreliable, requiring the Receiver and his Professionals to rely on third-party records.

Based upon the Receiver's review, of the $2.38 million of loan proceeds advanced by Genesis, $2.35 million was transferred out from the Defendants to other Super related entities or to Dr. Super personally. The loan advances never remained in the Defendants' accounts for more than a few days. Rather, the Defendants made transfers out of their respective bank accounts, either the same day, or in close proximity to, the date Plaintiffs advanced the funds. When questioned regarding these transfers, Dr. Super identified the recipients all as entities he owned and controlled. Further, in support of the alleged "management fees," Dr. Super provided only two management service agreements – both of which lacked financial terms and both of which show Dr. Super on both sides of the transaction.

As set forth herein, the Receiver recommends an expansion of his powers in order to assume full financial control of the Defendants and to pursue significant avoidance actions available under MCL § 566.5431, et seq.

**<u>Background</u>**

From May of 2021 through July of 2022 Genesis advanced Defendants approximately $2.4 million, secured by over 1,000 patient billings that were/are the subject of collection suits by various law firms. To date, Defendants (and other entities owned by Dr. Super) have returned approximately $870,000 to Genesis, leaving a balance owed of approximately $1.5 million,

Document received by the MI Wayne 3rd Circuit Court.

exclusive of any agreed upon interest or return.

In previous litigation, the parties settled their disputes with Defendants agreeing to substantial financial oversight afforded to the Plaintiffs. What followed was not what was envisioned. Indeed, the Defendants removing over $775,000 from a bank account without Plaintiffs' approval, thereby leading to the instant lawsuit. The Plaintiffs and Court were left with substantive questions regarding the viability of the Defendants' assets and the prospects for repayment. The Court appointed the Receiver in order to provide clarity and, pursuant to the Receivership Order, the Receiver furnishes this Report and Recommendation.

## **Actions taken by Receiver**

Since the acceptance of the Receivership on or about January 13, 2025, the Receiver has been faithfully discharging his duties pursuant to the Receivership Order. The Receiver, either individually or through counsel, has taken the following actions in furtherance of his duties including, without limitation:

1. The Receiver has met (virtually due to geographical reasons) and engaged in ongoing communication with the parties and/or their respective counsel regarding the subject matter of the receivership.

2. The Receiver received and reviewed documentation from the parties regarding the subject matter of the receivership. Substantially all of this documentation has been shared with counsel for the parties.

3. The Receiver requested documentation from the parties that would be customary to a dispute such as the present.

Document received by the MI Wayne 3rd Circuit Court.

4.  Though not required, the Receiver consistently requested that Defendants comply with the Receivership Order and his requests for information, giving extraordinary latitude to the Defendants.

5.  The Receiver evaluated the pleadings and positions of the parties.  The Receiver has kept the parties and the Court advised of his efforts.

6.  The Receiver has conducted his own, independent, analysis of the issues presented in the Receivership Order, including the same in this Report and Recommendation.

7.  The Receiver has reviewed information in the public record regarding the Receivership Estate.

8.  The Receiver has been in regular communication with the parties regarding the subject dispute and his ongoing findings.

9.  The Receiver has ensured compliance with the Receivership Order, including preventing interference with his duties.  When necessary, the Receiver has sought court intervention in order to ensure compliance with the Receivership Order.

10. On February 19, 2025, the Court entered the *Order Extending Deadline for Receiver's Report* because of Defendants' failure to cooperate and the outstanding documentation that was owed to the Receiver at that time.  **Exhibit B.**

11. The Receiver has retained professionals to assist in the performance of his duties under the Receivership Order.  The Receiver retained Stevenson & Bullock, P.L.C. to perform legal services on his behalf regarding the subject of the Receivership and Riveron to serve as financial advisor.  The analysis of Riveron is attached hereto as **Exhibit C.**

5

Document received by the MI Wayne 3rd Circuit Court.

**FINDINGS OF THE RECEIVER**

### a. *The Receivership Order*

12. On January 8, 2025, the Court entered the Receivership Order. The Receivership Order provides, *inter alia*, that the Receiver is authorized to investigate the financial affairs of the Defendants and to prepare a Report. The Report was to include detail regarding the following:

a. Accounts receivable;

b. Whether any Defendant has received payments on any Genesis-related account receivable that the Defendant did not pay over to Genesis and, if so, the details of those receipts, including whether the funds remain in the possession of any Defendant and, if not, when and to whom they were transferred;

c. Status of any other amounts owed by one or more of Defendants to Genesis;

d. Defendants' current assets;

e. Whether Defendants have sufficient assets to satisfy debts to Genesis; and

f. Any other information that, in the Receiver's reasonable business judgment, is relevant or necessary.

13. The Receivership Order also requires that an Accounting take place which includes the following: (i) the patient name, (ii) provider facility, (iii) dates of service, (iv) bill amount, (v) amount advanced by Genesis, (vi) whether the advance was from GAF IV or GAF V, (vii) the date of advance, (viii) case status, (ix) date when provider collected funds, (x) gross amount collected as returns, (xi) amount of returns paid to Genesis, and (xii) amount retained by provider (i.e., the difference between the previous two items) (collectively, the "<u>Accounting Criteria</u>").

14. This Report is furnished pursuant to the Receivership Order and addresses the above issues, in turn.

6

Document received by the MI Wayne 3rd Circuit Court.

### b. The Accounting – Agreement between the parties

15. As an initial matter, it was imperative that the Receiver identify the amount in controversy. Remarkably, there was not disagreement between Genesis and the Defendants. Both sides operated from similar – though manipulatable – documentation regarding the Accounting Criteria.

16. The Receiver worked in concert with his Professionals, including Riveron, to assist in his analysis.

17. Pursuant to the Order, this analysis began by reviewing detailed schedules maintained by Quantum Outsourcing Group ("Quantum"), a servicer responsible for the collection and tracking of payments received from law firms upon resolution/settlement of the numerous suits (i.e., the accounts receivables identified as collateral for the Genesis loans).

18. The Receiver discussed each of the files with Dr. Super and representatives of Genesis, and both parties provided updates for certain cases through February 13, 2025. In general, both parties agreed as to the amounts advanced by Genesis and the remaining principal balance of the loan amounts outstanding.

19. Further, the Receiver understands that Genesis engaged in an underwriting process when advancing funds to confirm the existence of patients, dates of service, and the like.

20. The Receiver's analysis shows that GAF V advanced approximately $2.1 million to Defendants and GAF IV advanced approximately $300,000 solely to Lint Chiropractic, for a total of approximately $2.4 million. The amount of these advances were verified via a review of Defendants' bank statements and detailed general ledgers, as well as transaction dates and banking information provided by Genesis.[1]

---

[1] There was an immaterial difference of $297.16 between amounts reflected in the Defendants'

7

Document received by the MI Wayne 3rd Circuit Court.

21.     To date, Defendants have collected approximately $1.4 million related to the subject suits, of which, approximately $870,000 has been remitted to Genesis and approximately $570,000 has been retained by the Defendants.  Based on the forgoing, the remaining principal balance owed to Genesis, exclusive of any agreed upon returns, is approximately **$1.5 million.**

22.     Next, the Receiver attempted to verify payments remitted to Genesis via the same review of Defendants' bank statements and general ledgers; however, the Receiver was unable to do so based on Defendants' general ledgers.

23.     For example, the parties agree that Defendants made a lump sum payment of $400,000 to Genesis in April of 2024, yet there is no record of such a disbursement in the Defendants' bank accounts or general ledgers.  According to Dr. Super, this lump sum payment was not made from Defendants' accounts, but rather, it came from MI Medical Management's account at JP Morgan Chase ending in 9899.

24.     When the Receiver requested copies of bank statements to corroborate this position, Dr. Super refused to provide them, claiming that the request was outside of the purview of the instant litigation.

25.     Notably, given the agreement of the parties, the Receiver is operating from the belief that such $400,000 was actually paid.  The Receiver is of the firm belief that Dr. Super's refusal to provide the requested bank statements is to shield further discovery by the Receiver regarding the substantial transfers made from the Defendants to MI Medical Management.

26.     The Receiver also attempted to verify the outstanding loan balance due to Genesis via a review of Defendants' books and records; however, there is no record of a loan amount due

---

bank statements and general ledgers as compared to the detailed schedules maintained by Quantum.

8

Document received by the MI Wayne 3rd Circuit Court.

to Genesis in either the Defendants' detailed general ledgers or tax returns. Rather (and remarkably), the Defendants' recorded Genesis' advances as "Business Income" in their books and records, rather than a loan.

27. In sum, it appears the parties are in agreement regarding the data included in the Accounting Criteria and that Genesis is owed no less than $1.5 million; however, the Receiver's efforts to surmise the same are telling when completing the other portions of this Report and Recommendation as required by the Receivership Order.

*c.* ***The Defendants are unlikely to satisfy the debts owed to Genesis from collections***

28. Next, the Receiver undertook an analysis regarding the Defendants' ability to repay the moneys owed to Genesis. The Defendants are not operating and have sold, abandoned, or otherwise dispossessed themselves of their tangible physical assets. The Defendants' principal, Dr. Super, resides in Florida and appears to attempt to manage matters remotely.

29. Defendants' collective cash balance in their respective checking and savings accounts totaled $3,776.70 as of January 31, 2025, and was deemed to be immaterial for purposes of assessing Defendants' ability to repay the subject Genesis loans.

30. The primary remaining assets held by the Defendants consist of a face value of approximately $5.1 million of active collection suits filed by various law firms; however, collectability is suspect. Indeed, numerous insurance companies have filed lawsuits against Defendant Lint Chiropractic alleging it submitted fraudulent, unlawful, and/or excessive insurance claims for services to Michigan auto accident victims.

31. Since the entry of the Receivership Order on January 8, 2025, Genesis has only received $17,535.00 in the lockbox account ordered pursuant to such order.

Document received by the MI Wayne 3rd Circuit Court.

32.     Even assuming that the Defendants reached their previous collection rates and remitted 100% of the collected funds to Genesis, they still would be unable to repay Genesis. Historically, the collection rate was approximately 28% for GAF V suits and 22% for GAF IV suits.  Extrapolating such numbers, the Defendants could potentially collect approximately $1.3 million from the remaining suits that are labeled as open/partial settlement/unknown, leaving approximately $200,000 unpaid without considering any interest, fees, or other charges that Genesis may assert due and owing.

33.     Moreover, it is the Receiver's experience that temporal delays generally lead to worse collectability results in outstanding receivables.

34.     Given the foregoing, the Defendants are unable to satisfy debts owed to Genesis from simply collection of outstanding receivables.

### d.     *Defendants transferred nearly all of the Genesis loan proceeds to insiders*

35.     Next, the Receiver attempted to trace the Genesis loan proceeds; however, such efforts were stonewalled by Defendants once the Receiver identified that such loan proceeds funneled in and out of the Defendants' coffers to other Super related entities.

36.     **Based upon the Receiver's review, of the $2.38 million of loan proceeds advanced by Genesis, $2.35 million was transferred out from the Defendants to other Super related entities or to Dr. Super personally.**

37.     The loan advances never remained in the Defendants' accounts for more than a few days.  Rather, the Defendants made transfers out of their respective bank accounts, either the same day, or in close proximity to, the date Genesis advanced the funds.  According to the Defendants' detailed general ledgers, the transfers out were recorded as an expense for "Management

10

Document received by the MI Wayne 3rd Circuit Court.

Fees/Services" and the funds were primarily sent to MI Medical Management and Medical Capital Solutions accounts at JP Morgan Chase bank (accounts ending 7072/9899 and 3028, respectively).

38.     Below is a snapshot of just *some* of the banking activity for the days when loan proceeds were received by the Defendants:

| Date | Genesis Fund | Defendant Entity | Defendant Bank | Defendant Bank Account Ending | Genesis Advance Amount | Defendant Transfers | Timing of Defendant Transfers | Notes regarding Defendant transfers out of bank account |
|---|---|---|---|---|---|---|---|---|
| 3/28/2022 | GAF V | Lint | Fifth Third | 4807 | $ 124,675.00 | $ (124,000.00) | Same Day | On 3/28/22 $124,000 was transferred to Medical Capital Solutions labeled as "Management Services" expense. |
| 3/28/2022 | GAF V | Diagnostic | JP Morgan Chase | 6151 | $ 67,200.00 | $ (67,200.00) | Same Day | On 3/28/22 $67,200 was transferred to Medical Capital Solutions account ending '3028 labeled as "Management Fees" expense. |
| 5/19/2022 | GAF V | Lint | Fifth Third | 4807 | $ 337,622.95 | $ (335,000.00) | Same Day | On 5/19/22 $335,000 was transferred to Medical Capital Solutions labeled as "Management Services" expense. |
| 5/19/2022 | GAF V | Supplies | JP Morgan Chase | 5012 | $ 94,800.00 | $ (80,000.00) | Same Day | On 5/19/22 $80,000 was transferred to Medical Capital Solutions account ending '3028 labeled as "Management Fees" expense. |
| 6/21/2022 | GAF V | Diagnostic | JP Morgan Chase | 6151 | $ 206,520.00 | $ (206,000.00) | Same Day | On 6/21/22 $206,000 was transferred to Medical Capital Solutions account ending '3028 labeled as "Management Fees" expense. |
| 7/26/2022 | GAF V | Lint | Fifth Third | 4807 | $ 283,962.58 | $ (283,000.00) | Same Day | On 7/26/22 $200,000 was transferred to Medical Capital Solutions labeled as "Management Services" expense and $83,000 was transferred to Lint Chiropractic JP Morgan Chase account ending '0000. Three days later on 7/29/22 Lint Chiropractic JPMorgan Chase accounting ending '0000 transferred $100,000 to account ending '9899 which is MI Medical Management. |

39.     When the Receiver requested Dr. Super produce copies of the bank statements for the recipient entities, Dr. Super refused.

40.     It is clear from the Profit and Loss Statements that the Defendants transferred the majority of amounts reported as income to other entities owned and/or controlled by Dr. Super and recorded such transfers as an expense item labeled "Management Fees/Services."

41.     In support of the alleged "management fees," Dr. Super provided two management service agreements. The first agreement was between Lint Chiropractic, P.C., MI Medical Management, LLC and Diagnostic Chiropractic, P.C. The second agreement was between Lint Chiropractic, P.C., MI Medical Management, LLC. and Lint Chiropractic II, P.C. Both agreements appeared to be identical and contained sections regarding management fees, however the terms and amounts were blank. In addition, Dr. Super executed both agreements on behalf of all the entities involved and, when interviewed by the Receiver, confirmed that all of these entities are owned and controlled by him and stated that the entities "were" him.

11

Document received by the MI Wayne 3rd Circuit Court.

42. Notably, management services agreements were not provided to support management fees paid to Medical Capital Solutions, and no agreements were produced related to Supplies Plus MI, LLC.

43. The Receiver identified the following accounts that were recipients of Genesis loan proceeds (following their brief shelf life with the Defendants); however, Dr. Super refused to provide the recipient bank account statements:

| Bank Account No. | Entity | Produced |
| --- | --- | --- |
| 7072 | MI Medical Mgt | NO |
| 9899 | MI Medical Mgt | NO |
| 3028 | Medical Capital Solutions | NO |
| 9527 | Dr. Super Personal Account | NO |
| 3201 | Dr. Super Personal Account | NO |
| 6788 | Dr. Super Personal Account | NO |
| 8292 | Lint II, Professional Services | NO |

44. Given all of the foregoing, it is the Receiver's opinion that there are significant avoidance actions available under MCL § 566.5431, *et seq.* that can and should be pursued.

## RECOMMENDATION AND CONCLUSION

The Receiver believes that it is appropriate that the Court order the expansion of his powers in order to assume full control of the Defendants' assets and to pursue claims against third parties in order to recover fraudulent transfers and/or any other claims in law or equity available.   The Defendants simply have no hope of repaying the funds they readily admit owing to the Plaintiffs.

*[Signature on following page]*

Document received by the MI Wayne 3rd Circuit Court.

Respectfully submitted,
**STEVENSON & BULLOCK, P.L.C.**

By: /s/ Charles D. Bullock
Charles D. Bullock (P55550)
*Court Appointed Receiver*
Elliot G. Crowder (P76137)
*Counsel for Receiver*
26100 American Drive, Suite 500
Southfield, MI 48034
Phone: (248) 354-7906
Facsimile: (248) 354-7907
Email: cbullock@sbplclaw.com
Email: ecrowder@sbplclaw.com

Dated: March 28, 2025

13

Document received by the MI Wayne 3rd Circuit Court.

EXHIBIT
C

STATE OF MICHIGAN
IN THE BUSINESS COURT
FOR THE COUNTY OF WAYNE

GENESIS ALTERNATIVE FINANCE IV LLC,
and GENESIS ALTERNATIVE FINANCE V LLC,

                                     Case No. 24-010404-CB

    Plaintiffs,                          Hon. Annette J. Berry

v.

LINT CHIROPRACTIC PC, DIAGNOSTIC
CHIROPRACTIC MI, P.C., and SUPPLIES
PLUS MI, LLC.,

    Defendants.

---

## ORDER FOR RECEIVERSHIP AND OTHER RELIEF

At a session of said Court held in the Courthouse in
the City of Detroit County of Wayne, and
State of Michigan on ___January 8___, 2024

**PRESENT: HON.** JUDGE ANNETTE J.
BERRY
**Circuit Court Judge**

This matter coming before the Court on Defendants' motion to withdraw and

for a stay of proceedings and on Plaintiffs' motion for appointment of a Receiver, and

the Court being fully advised in the premises, the Court has determined that:

- it has jurisdiction over this matter, under, *inter alia*, MCL 600.2926.

- Genesis has demonstrated at least an apparent right, title, or interest

  in certain accounts receivable held by Defendants

- Genesis has demonstrated that some or all of those accounts or their

  revenue-producing potential appear to be in danger of waste, loss,

  dissipation, or impairment

1

- the appointment of Charles D. Bullock as Receiver (as defined below) is just and appropriate under the circumstances

- the Receiver's authority and duties as set forth below are both just and appropriate

- notice requirements under MCL 554.1013 have been satisfied

- good cause exists to enter this Order

- multiple grounds set forth in MCL 554.1016 appear to be satisfied for the appointment of a receiver.

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

**I.    Secured Accounts Receivable and Letter of Direction.**

A.    Defendants will execute and either will send or will cause to be sent letters of direction to all collections counsel substantially in the form of Exhibit 1 to this Order.

B.    All incoming payments for outstanding Genesis-related accounts receivable owed to Defendants will be routed directly to the account referenced in Exhibit 1.

C.    Any disagreement concerning amounts due to Plaintiffs will not excuse payment of undisputed amounts.

D.    Until further contrary order of the Court, all individual Genesis-related receivables will be treated as part of a "batch." For the avoidance of doubt, this "batch" treatment means that Genesis is entitled to and should receive and retain the full amount of each payment for any individual receivable until Plaintiffs have received

the full value of the total amount pledged to Plaintiffs for all Genesis-related receivables.

**II.  Receivership**

A.  Effective and commencing immediately upon the entry of this Order, Charles D. Bullock (P55550) of Stevenson & Bullock, P.L.C., 26100 American Drive, Suite 500, Southfield, MI 48034 (the "Receiver") shall be and is hereby appointed as Receiver over Lint Chiropractic PC, Diagnostic Chiropractic MI, P.C., and Supplies Plus MI, LLC (collectively, the "Businesses") with the powers as receiver of the Businesses as set forth herein, exclusively for the purposes of carrying out the Receiver's obligations under this Order.

B.  Authority of the Receiver.

1.  The Receiver is appointed pursuant to, *inter alia*, MCL § 600.2926 and MCR 2.622.

2.  The purposes of this Receivership include the preparation of the Accounting and Receiver Report (the "Report") detailed below.

3.  The Receiver is authorized to exercise all powers and authority reasonably necessary to prepare the Report detailed below.

4.  Without limiting the foregoing, the Receiver shall have the powers to employ and to contract with professionals and others, including but not limited to counsel, accountants, assistants, agents, private investigators, consultants, advisors, bookkeepers, and other third-parties (collectively, the "Professionals") as he deems necessary to carry out his duties related to preparation of the Report.

3

5. The Receiver is authorized, directed and vested with the authority to access all books, records, financial accounts, and any other information in the possession of, or relating to the Businesses' assets and property, real, personal, or mixed, tangible and intangible, and wherever situated, , whether maintained in physical or electronic form, for the purpose of preparing the Report detailed below (collectively, the "Receivership Records"), and to exercise control over the Receivership Estate, and will have, among others, the following specific powers:

6. The Receiver and his Professionals may review confidential patient records as necessary and appropriate to discharge the Receiver's duties and responsibilities under this Order, provided however, that the Receiver protects the confidentiality of such records as required under applicable law and regulations including, but not limited to, the Health Insurance Portability and Accountability Act of 1996 and the federal HIPAA privacy regulations at 45 Code of Federal Regulations.

C. This Court retains jurisdiction to hear additional motions.

1. After the filing by the Receiver of the Report, upon motion by any party or upon application by the Receiver, the Court will consider whether to expand or reduce the scope of the Receiver's authority.

2. This Court retains jurisdiction to hear and determine all matters arising from or related to the implementation and enforcement of this Order.

D.      The authority granted to the Receiver is self-executing, unless the action otherwise requires approval by this Court.

### III.    Accounting and Receiver Report

A.      An accounting shall be performed about all accounts receivable in which any of Plaintiffs alleges an interest (i.e. accounts receivable which have been identified as security for amounts advanced by Genesis). The information of the accounting shall include (but need not be limited to):

1.      the patient name,

2.      provider facility,

3.      dates of service,

4.      bill amount,

5.      amount advanced,

6.      whether the advance was by or from Genesis IV or V,

7.      date of advance,

8.      case status,

9.      date when provider collected funds,

10.     gross amount collected as returns,

11.     amount of returns paid to Genesis, and

12.     amount retained by provider (i.e., the difference between the previous two items)).

B.      To the extent the servicer or any party or anyone acting on behalf of a party has prepared such an accounting, the Receiver shall begin by reviewing such prepared accounting.

C. The Receiver shall prepare a Report on

1. Accounts receivable;

2. Whether any Defendant has received payments on any Genesis-related account receivable that the Defendant did not pay over to Genesis and, if so, the details of those receipts, including whether the funds remain in the possession of any Defendant and, if not, when and to whom they were transferred;

3. The status of any other amounts owed by one or more of Defendants to Genesis;

4. Defendants' current assets;

5. Whether Defendants have sufficient assets to satisfy debts to Genesis;

6. Any other information set forth in Section III(A) necessary to complete the Report;

7. Any other information that, in the Receiver's reasonable business judgment, is relevant or necessary.

D. The Receiver must file his Report with the Court no later than Monday, February 17, 2025.

E. Subject to the other rules governing the filing of confidential information, the Receiver will be in compliance with the February 17, 2025 deadline if he files a report with potentially confidential information redacted, provided he also

files the appropriate requests to redact, to file unredacted versions underseal, or both by February 17, 2025.

## IV. Additional Provisions about Receiver.

A. Defendants and their principals, officers, and executives must cooperate with the Receiver.

1. Defendants, including their principals, officers, executives, agents, affiliates, and assigns must make available to the Receiver for inspection and copying all of the records concerning the Receivership Estate as the Receiver determines, in his good-faith reasonable business judgment, to be necessary or helpful for the Receiver, to fulfill his duties under the terms of this Order.

2. The Plaintiff and Defendants and their agents and employees shall fully cooperate with the Receiver at all times during the pendency of the receivership.

3. Absent further order of the Court, disagreement as to whether requested cooperation is necessary, helpful, or appropriate to the Receiver does not excuse the requirement to cooperate.

4. The failure of one or more Defendants to cooperate with the Receiver (such as, for example, refusing to answer in good-faith one or more questions asked by the Receiver) will be cause for entry of a order expanding the Receiver's powers, holding one or more Defendants in contempt of court, similar appropriate relief, or some combination thereof.

7

B.  Compensation:  The Receiver and his Professionals shall receive compensation for their services, payable from the Receivership Estate at their prevailing rates, which range from $135.00 per hour to $470.00 per hour, notwithstanding any statutory presumption.

1.  The Receiver and his Professionals shall also be reimbursed for out-of-pocket expenses related to the performance of their duties.  The compensation and reimbursed expenses shall be an administrative claim against the Receivership Estate and entitled to priority over any and all secured, priority, and unsecured claims.

2.  The Receiver and his Professionals shall issue invoices to the parties to this action, through their respective counsel (as applicable), on a monthly basis.

3.  The Receiver and his Professionals may receive payment on a monthly basis, without further Court Order, provided no objections are filed with the Court and served upon the Receiver, his Professionals, and all other parties in interest within ten (10) business days after such invoices are sent by electronic mail to all parties' counsel of record or principal of the party if such party is unrepresented.

a.  In the event that an objection is timely filed with the Court and served upon the Receiver, Professionals, and all other parties in interest, and after the Receiver rejects that objection in whole or in part,

in writing, the objecting party shall file a motion with this Court requesting that this Court determine the propriety of the fees sought.

b. In the event that the objecting party fails to file a motion with this Court within five (5) business days after being informed in writing that the Receiver rejects the objection in whole or in part, the objection to the requested fees or expenses is waived.

c. In the objection and the motion, the objecting party shall articulate with specificity which time or expense entries are objectionable and the reason for the objection.

d. In the event that a motion is timely filed, the Receiver is authorized to pay himself and his Professionals those fees and expenses to which no objection has been raised.

4. The Receiver may instruct the Defendants to pay (from assets of the Receivership Estate) any and all of the Professionals from the Receivership Estate.

a. Defendants must acknowledge any such instruction within one business day and must make such payment within five calendar days.

b. If, following Receiver's instruction, one or more Defendants either fail to acknowledge the instruction within one business day or fail to make such payment within five calendar days (or both), the Receiver may apply for immediate emergency relief, including but not limited to an order

removing authority over Defendants' assets from Defendants (and their principals, officers, and agents) and granting such authority to the Receiver.

      i.    Defendants will be liable for any fees and costs incurred by the Receiver or *any party* in connection with such application for emergency relief and related proceedings.

      ii.    The foregoing paragraph IV(B)(4)(i) does not limit or restrict any other source of liability of Defendants for fees or costs.

5.    In the event that the assets of the Receivership Estate is are insufficient to pay the **approved** compensation for the Receiver and his Professionals, the Plaintiffs shall pay the same, which shall be added to the indebtedness owed to Plaintiffs by Defendants and shall be secured by any liens possessed by Plaintiffs. Nothing in this paragraph IV(B)(5) is meant to limit the rights of Plaintiffs (or any other party or the Receiver) under any other part of this paragraph IV(B), any other part of this Order, or under law.

C.    <u>Immunity</u>

1.    Neither the Receiver nor his Professionals shall be liable for any claim, objection, liability, action, cause of action, cost, or expense of the Plaintiff, Defendants, or Receivership Estate arising out of or relating to events or circumstances occurring prior to this Order, including, without limitation, any contingent or unliquidated obligations and any liability from the performance of services rendered by third parties on behalf of the Receivership Estate, and any liability to which the Receivership Estate is currently or may

ultimately be exposed under any applicable laws pertaining to the ownership, use, or operation of the Receivership Estate (collectively, all of the foregoing are referred to as the "Pre-Receivership Liabilities"). Similarly, neither the Receiver nor his Professionals shall be liable for any claim, objection, liability, action, cause of action, cost, or expense of Plaintiff, Defendants, or Receivership Estate arising out of the performance of receivership duties without the express written permission of this Court authorizing a lawsuit against the Receiver or the Professionals.

2. The Receiver and his Professionals, employees, agents, and attorneys shall have no personal liability, and they shall have no claim asserted against them relating to the Receiver's duties under this Order, except for claims due to their intentional tortious acts, breaches of fiduciary duty, gross negligence, gross or willful misconduct, acts committed in bad faith, malicious acts, and/or the failure to comply with the Court's Orders.

D.    Restraint on action against Receiver and Receivership Estate: Except as otherwise ordered by this Court, the parties, their agents, and employees, and all other persons with notice of this Order (other than the Receiver) are restrained and enjoined from directly or indirectly transferring, encumbering, removing, expending, distributing, concealing, destroying, mutilating, damaging, erasing, altering, disposing of, or otherwise diminishing any property of the Receivership Estate, doing any act to interfere with the Receiver from carrying out his duties.

1. Nothing in this paragraph IV(D) restricts the rights of Genesis with respect to its security interests.

2. To the extent that any other lender or other creditor of one or more Defendants has a security interest in any accounts receivable or other asset of one or more Defendants, Defendants may identify that lender or other creditor and the security interests, with specificity, to both Plaintiffs and Receiver. Following such identification, nothing in this paragraph IV(D) will restrict the rights of those lenders or other creditors with respect to their security interests, absent further order of the Court.

E. Directives to financial institutions, employers, and others:

1. Pending further order of this Court, any financial or brokerage institution, business entity, or person, that holds, controls, or maintains custody of any account or asset, or at any time since May 18, 2021, has held, controlled, managed or maintained custody of any account or asset owned by, in the name or for the benefit of the Receivership Estate, shall:

    a. Provide the Receiver, within five (5) business days of receiving a copy of this Order, a statement setting forth:

        i. The identification number of each and every account or asset tiled in the name, individually or jointly, of or held on behalf of, or for the benefit of the Receivership Estate;

        ii. The balance of each such account, or a description of the nature and value of such asset as of the close of business on

the day on which this Order is served, and, if the account or other asset has been closed or removed, the date closed or removed, the total funds removed to close the account, and the name of the person or entity to whom such account or other asset was remitted;

iii. The identification of any safe deposit box that is either titled in the name of the Receivership Estate or jointly with, another person or entity or is otherwise subject to access by the Receivership Estate; and

iv. Upon request by the Receiver, promptly provide copies of all records or other documentation pertaining to such account or asset, including, but not limited to, originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, and all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs.

F. Delivery of possession of Receivership Estate to Receiver

1. This Court commands the Sheriff of Wayne, or any other court officer that the Receiver may choose to employ, that without delay, deliver to the Receiver possession of the Receivership Records (as defined above to include all books, records, financial accounts, and any other information in the possession of, or relating to the

Businesses' assets and property, real, personal, or mixed, tangible and intangible, and wherever situated, , whether maintained in physical or electronic form, for the purpose of preparing the Report) and, if necessary, to use force as required and if the premises are not voluntarily opened to use a locksmith for said purpose.

2. After service of this Order upon the Plaintiff, Defendants, and any other person or entity served with a copy of this Order, shall deliver to the Receiver:

a. Possession and custody of documents of the Receivership Estate, including but not limited to, all books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers), title documents and other papers;

b. All keys, computer passwords, entry codes, and combination locks necessary to gain access or to secure access to any of the assets or documents of the Receivership Estate, including but not limited to; means of communications, account, computer systems, or other property; and

c. Information identifying the accounts, properties or other assets or obligations of the Receivership Estate.

G. Miscellaneous

14

1.      Each Defendant and any entity in which any of the Defendants have a controlling or majority interest must execute any document deemed necessary by the Receiver, including but not limited to a Business Associate Agreement in the form approved by the Receiver. A sample Business Associate Agreement is attached hereto as Exhibit B; however, Receiver may, in his sole discretion, modify the Business Associate Agreement.

2.      The Receiver shall, during the pendency of this action, have the right to apply to this Court for further instructions or directions.

3.      The Receiver shall not be responsible for the preparation or filing of any tax returns for the Receivership Estate (including income, personal property, commercial activity, gross receipts, sales and use, or other tax returns) other than to provide the parties with information in the Receiver's possession that is necessary for the parties to prepare such tax returns.

4.      The Receiver shall file and serve his acceptance of this receivership.

5.      The Receiver is not required to post a bond.

## V.      Limitations on disposition, disbursement, and encumbrance of assets

A.      Defendants have represented that they are not conducting any business other than the collection of accounts receivable, and that this business is being handled by collections counsel.

B.      Defendants therefore may not disburse, dispose of, or otherwise encumber assets without the express authorization of the Receiver for any purpose, except as necessary

1.  to retain and pay counsel, or

2.  to pay amounts owed to Plaintiffs.

C.  These limitations on disposition, disbursement, and encumbrance of accounts receivable which have been identified as security for amounts advanced by Genesis, like all other aspects of this Order, are subject to review and modification by the Court and do not apply to payments of amounts owed to Plaintiffs.

## VI.  Counsel for Defendants.

A.  Fink Bressack's motion to withdraw as counsel is GRANTED.

B.  Defendants must retain replacement counsel and ensure that such counsel files an appearance no later than Friday, January 17, 2025.

1.  If any one or more Defendants fail to cause counsel to appear by Friday, January 17, 2025, that failure will constitute a default by that Defendant.

2.  If any one or more Defendants fail to cause counsel to appear by Friday, January 17, 2025, that failure will be grounds for entry of a default judgment against Defendants.

C.  The depositions previously noticed for January 16 and 17, 2025 are ADJOURNED to a future date to be scheduled once Defendants' new counsel has filed an appearance.

D.  The parties may not serve discovery on one another or file any motions with respect to this litigation, until Monday, February 17, 2025.

E.   Notwithstanding the foregoing, the parties are not restricted from filing motions to amend this order or motions otherwise concerning the scope of the Receiver's authority.

**This is not a final order and does not close the case.**

/s/ Annette J. Berry
January 8, 2025

1/8/2025

**Date**　　　　　　　　　　　　**CIRCUIT COURT JUDGE**

**APPROVED AS TO FORM ONLY**

/s/ Michael Leo Pomeranz
**TAFT STETTINIUS & HOLLISTER, LLP**
Michael Leo Pomeranz (P84908)
Kenneth I. Nelson (P87217)
*Attorneys for Plaintiffs*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
248.351.3000
mpomeranz@taftlaw.com
knelson@taftlaw.com

/s/ David H. Fink
**FINK BRESSACK**
David H. Fink (P28235)
Nathan J. Fink (P75185)
David A. Bergh (P83696)
38500 Woodward Ave., Suite 350
Bloomfield Hills, MI 48304
248-971-2500
dfink@finkbressack.com
nfink@finkbressack.com
dbergh@finkbressack.com

EXHIBIT 1

EMAIL COVER NOTICE

Email Subject Line: OFFICIAL NOTICE: *Update to Servicing and Payment Information of Certain Receivables*

Dear [LAW FIRM],

We write to inform you that pursuant to that certain Servicing Agreement between Quantum Outsourcing Group ("Servicer") and Lint Chiropractic, P.C., Diagnostic Chiropractic MI, P.C., and Supplies Plus MI, LLC (collectively, "Provider"), dated December 11, 2023, Quantum is now servicing those receivables set forth in the attached Exhibit A. Please note all payoff information, payments for these accounts and reduction and payoff requests should be directed to Quantum at the address listed below.

We are attaching an irrevocable letter of instruction confirming this arrangement and ask that you return a signed copy of the acknowledgement attached as soon as possible.

Servicer now has the sole right and authority to perform all servicing activities with respect to the listed receivables including collection of payment. Accordingly, please direct all payments relating to the receivables listed in Exhibit A to Servicer at the following address.

| Payment should be remitted to Quantum Outsourcing at the address listed below: | |
| --- | --- |
| For USPS standard mail: | Quantum Outsourcing<br>PO Box 786112<br>Philadelphia, PA 19178 |
| For private carriers (e.g., FedEx, UPS), overnight deliveries, or deliveries requiring signature: | Lockbox Services 786112<br>ATTN: Quantum Outsourcing<br>Mac Y1372-045<br>2005 Market Street, 5th Floor<br>Philadelphia, PA 19103 |

For any servicing related inquires, please reach out to asad@quantumog.com.

Any payment made in a manner, or to a recipient, other than in accordance with the instructions set forth herein will be insufficient to discharge the applicable payor's obligations in respect of the subject accounts.

Additionally, Servicer (Quantum) will be in touch to verify case status on all of the outstanding cases for our records. We appreciate your full cooperation as they complete this important function.

Sincerely,

Robert Super
Lint Chiropractic
Supplies Plus
Diagnostic Chiro

FORMAL LETTER

INSERT NAME AND ADDRESS OF LAW FIRM

Re: *Update to Servicing and Payment Information of Certain Receivables*

Dear Sir or Madam:

My name is Robert Super, the CEO of Lint Chiropractic, Supplies Plus, and Diagnostic Chiro (collectively, "Provider"), with authority to bind Provider. Pursuant to that certain Servicing Agreement between Quantum Outsourcing Group ("Servicer") and Provider, dated December 11, 2023, Servicer is now servicing those receivables set forth in the attached Exhibit A. Provider has conveyed to Servicer the right to service and collect payments for the receivables related to those cases listed on Exhibit A (attached).

Provider hereby irrevocably instructs and authorizes you to pay all monies from time to time owing or that become due in relation to those cases listed on Exhibit A as follows:

| Payment should be remitted to Quantum Outsourcing at the address listed below: | |
| --- | --- |
| For USPS standard mail: | Quantum Outsourcing<br>PO Box 786112<br>Philadelphia, PA 19178 |
| For private carriers (e.g., FedEx, UPS), overnight deliveries, or deliveries requiring signature: | Lockbox Services 786112<br>ATTN: Quantum Outsourcing<br>Mac Y1372-045<br>2005 Market Street, 5th Floor<br>Philadelphia, PA 19103 |

You shall direct funds to the above address unless and until such time as you receive written notice from **SERVICER** with alternate instructions. This authority and instruction may not be modified, terminated or revoked without the prior written consent of **SERVICER**. Provider <u>may not</u> modify, terminate or revoke these instructions.

Any requests for payoff amounts or reductions must be addressed in writing to Servicer at asad@quantumog.com.

As you may know, attorneys have an ethical and legal obligation to properly direct funds upon settlement of a case, and may face civil liability or other consequences for failure to properly do so. *See, e.g., Alaska Ethics Op. 92-3 (1992); Alabama Ethics Op. 90-48 (1990); California Ethics Op. 1988-101 (1988); Ohio Ethics Op. 95-12 (1995);* and *Wisconsin Ethics Op. E-09-01 (2017).* Servicer will pursue any and all available remedies should payment for the subject receivables be misdirected.

Each time any funds are transferred to Servicer pursuant to the above instructions, you shall send an email containing the patient name(s) and claim number(s) to which the funds relate, the amount of funds transferred, and the date of the transfer to rsuper@allcaremgt.com.

Any payment made in a manner, or to a recipient, other than in accordance with the instructions set forth herein will be insufficient to discharge the applicable payor's obligations in respect of the subject accounts.

Please signify your acknowledgment and agreement hereto by signing and returning to Servicer the acknowledgment and confirmation set out below.

Very truly yours,

_____
(signature)

Robert Super, CEO
Lint
Supplies Plus
Diagnostic Chiro

Gary Smith, CEO
Quantum Outsourcing Group
2963 Gulf to Bay Blvd
Suite 120
Clearwater, FL 33759

|  |  |
|  |  |

## ACKNOWLEDGMENT AND AGREEMENT

I HEREBY ACKNOWLEDGE AND AGREE AS OF THE __ DAY OF _____, 202_ THAT I HAVE READ AND UNDERSTOOD THE LETTER FROM [LINT ET AL] AND QUANTUM OUTSOURCING GROUP ("SERVICER") IN REFERENCE TO THE SERVICING UPDATE RELATED TO SERVICING AND PAYMENTS OF CERTAIN RECEIVABLES AND MY LAW FIRM WILL DIRECT PAYMENTS RELATED TO THE RECEIVABLES REFERENCED IN THAT LETTER ONLY TO SERVICER AT THE FOLLOWING ADDRESS:

| Payment should be remitted to Quantum Outsourcing at the address listed below: | |
|---|---|
| For USPS standard mail: | Quantum Outsourcing<br>PO Box 786112<br>Philadelphia, PA 19178 |
| For private carriers (e.g., FedEx, UPS), overnight deliveries, or deliveries requiring signature: | Lockbox Services 786112<br>ATTN: Quantum Outsourcing<br>Mac Y1372-045<br>2005 Market Street, 5th Floor<br>Philadelphia, PA 19103 |

I WILL PROVIDE INFORMATION SERVICER MAY REASONABLY REQUEST FROM TIME TO TIME THAT DOES NOT VIOLATE ATTORNEY/CLIENT PRIVILEGE;

IN THE EVENT I CEASE FOR ANY REASON TO BE COUNSEL, I WILL NOTIFY SERVICER OF SUCH FACT AND OF ANY SUCCESSOR COUNSEL, AND WILL NOTIFY SUCCESSOR COUNSEL, AND ANY PERSON WHO INQUIRES, OF MIGHTY'S INTEREST AND LIEN;

I WILL *NOT* DISBURSE ANY FUNDS WHATSOEVER TO CLIENT WITHOUT FIRST PAYING SERVICER IN FULL. I ACKNOWLEDGE THAT ANY PAYMENT MADE IN A MANNER, OR TO A RECIPIENT, OTHER THAN IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH HEREIN WILL BE INSUFFICIENT TO DISCHARGE THE APPLICABLE PAYOR'S OBLIGATIONS IN RESPECT OF THE SUBJECT ACCOUNTS.

_____

[LAW FIRM]

**EXHIBIT 2**

24

## Business Associate Agreement

This Business Associate Agreement (the "Agreement") is made effective as of _____ by and between Charles D. Bullock, Receiver (the "Receiver") and _____ _____.

1. **Definitions.**
   a. The following terms used in this Agreement shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use.

   b. <u>Business Associate</u>. "Business Associate" shall generally have the same meaning as the term "Business Associate" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean the Receiver.

   c. <u>Covered Entity</u>. "Covered Entity" shall generally have the same meaning as the term "Covered Entity" at 45 CFR 160.103, and in reference to the party to this agreement, shall mean [Insert Name of Covered Entity].

   d. <u>HIPAA Rules</u>. "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

2. **Obligations and Activities of Business Associate**
   a. Business Associate agrees to:
      i. Not use or disclose protected health information other than as permitted or required by the Agreement or as required by law;

      ii. Use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Agreement; and

iii.     Report to Covered Entity any use or disclosure of protected health information not provided for by the Agreement of which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware;

iv.     In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of the Business Associate agree to the same restrictions, conditions, and requirements that apply to the Business Associate with respect to such information;

v.     Make available protected health information in a designated record set to the Covered Entity as necessary to satisfy Covered Entity's obligations under 45 CFR 164.524;

vi.     Make any amendment(s) to protected health information in a designated record set as directed or agreed to by the Covered Entity pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy Covered Entity's obligations under 45 CFR 164.526;

vii.     Maintain and make available the information required to provide an accounting of disclosures to the Covered Entity as necessary to satisfy Covered Entity's obligations under 45 CFR 164.528;

viii.     To the extent the Business Associate is to carry out one or more of Covered Entity's obligation(s) under Subpart E of 45 CFR Part 164, comply with the requirements of Subpart E that apply to the Covered Entity in the performance of such obligation(s); and

ix.     Make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

3. **Permitted Uses and Disclosures by Business Associate**
    a. Business Associate may use or disclose protected health information pursuant to the terms and in the *Order for Receivership* (the "Receivership Order") entered in the Circuit Court for the County of Wayne, Case No. 24-010404-CB (the "Litigation") and as necessary to accomplish the purpose of the receivership.

    b. Business Associate may use or disclose protected health information as required by law.

    c. Business Associate agrees to make uses and disclosures and requests for protected health information consistent with the Receivership Order.

    d. Business Associate may use protected health information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

    e. Business Associate may disclose protected health information for the proper management and administration of Business Associate or to carry out the legal responsibilities of the Business Associate, provided the disclosures are required by law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

4. **Provisions for Covered Entity to Inform Business Associate of Privacy Practices and Restrictions**
    a. Covered Entity shall notify Business Associate of any limitation(s) in the notice of privacy practices of Covered Entity under 45 CFR 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of protected health information.

b. Covered Entity shall notify Business Associate of any changes in, or revocation of, the permission by an individual to use or disclose his or her protected health information, to the extent that such changes may affect Business Associate's use or disclosure of protected health information.

c. Covered Entity shall notify Business Associate of any restriction on the use or disclosure of protected health information that Covered Entity has agreed to or is required to abide by under 45 CFR 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of protected health information.

5. **Term and Termination**
   a. <u>Term and Termination</u>. The Term of this Agreement shall be effective as of the Effective Date and shall terminate on the date Business Associate terminates this Agreement or the date of the entry of an order terminating the Business Associate as receiver in the Litigation, whichever is sooner.

EXHIBIT
D

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE
BUSINESS COURT DIVISION

GENESIS ALTERNATIVE FINANCE IV LLC,
and GENESIS ALTERNATIVE FINANCE V LLC,

Case No. 24-010404-CB
Hon. Annette J. Berry

Plaintiffs,

v

LINT CHIROPRACTIC PC, DIAGNOSTIC
CHIROPRACTIC MI, P.C., and SUPPLIES
PLUS MI, LLC.,

Defendants.

| | |
|---|---|
| TAFT STETTINIUS & HOLLISTER, LLP<br>Michael Leo Pomeranz (P84908)<br>Attorney for Plaintiffs<br>27777 Franklin Road, Suite 2500<br>Southfield, MI 48034<br>(248) 351-3000<br>mpomeranz@taftlaw.com | THE LAW OFFICES OF GREGORY J.<br>ROHL, P.C.<br>Gregory J. Rohl (P39185)<br>Attorney for Defendants<br>4051 Haggerty Road<br>West Bloomfield, MI 48323<br>(248) 380-9404<br>greg@rohllaw.com |

**ORDER GRANTING PLAINTIFFS' MOTION TO HOLD DEFENDANTS IN
CONTEMPT OF COURT AND FOR SANCTIONS**

At a session of said Court held in the Circuit Court
for the County of Wayne, City of Detroit, State of Michigan,
on _____ 4/7/2025

PRESENT: JUDGE ANNETTE J.
BERRY

This matter having come before the Court on Plaintiffs' Motion to Hold Defendants in

Contempt of Court and for Sanctions and the Court being otherwise fully advised in the premises:

**IT IS HEREBY ORDERED** that Defendants' principals, Dr. Robert Super and Rick

Geller will sit for depositions in Michigan, without prejudice to Plaintiffs deposing other witnesses,

including corporate representatives of Defendants.

**IT IS FURTHER ORDERED** that within seven (7) days from the entry of this Order, Defendants will pay Plaintiffs $10,000 for attorneys' fees and costs related to dealings with the Receiver and bringing the Motion to Hold Defendants in Contempt of Court and for Sanctions, without prejudice to Plaintiffs' right to seek additional fees and costs later in the litigation.

**IT IS SO ORDERED**.

*This Order does not resolve the last pending claim or close the case.*

DATED: ___4/7/2025___

/s/ Annette J. Berry
April 7, 2025
CIRCUIT COURT JUDGE

APPROVED AS TO FORM AND CONTENT NOTICE OF ENTRY WAIVED:

TAFT STETTINIUS & HOLLISTER LLP      THE LAW OFFICES OF GREGORY J. ROHL, P.C.

*/s/ Michael Leo Pomeranz*      /s/ _____
Michael Leo Pomeranz (P84908)      Gregory J. Rohl (P39185)
Attorney for Plaintiffs      Attorney for Defendants